1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WESLEY MITCHELL,                        No.  2:11-cv-1240 JAM AC P

12              Plaintiff,

13        v.                                 FINDINGS & RECOMMENDATIONS

14   MATTHEW L. CATE, et al.,

15              Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this action filed

18   pursuant to 42 U.S.C. § 1983.  The court currently has before it defendants' motion for summary

19   judgment, which argues that they did not violate plaintiff's constitutional rights under the First,

20   Eighth, or Fourteenth Amendments and, alternatively, that they are entitled to qualified immunity.

21   ECF No. 65.  Plaintiff has filed a response (ECF No. 84) and defendants have replied (ECF No.

22   87).

23   I.       Plaintiff's Allegations

24        On May 4, 2011, plaintiff submitted his ten count complaint.  ECF No. 1.  The complaint

25   made various allegations against defendants Matthew Cate, Scott Kernan, Steven Chapman, Mike

26   McDonald, R.L. Gower, D. Davey, D. Clark, D. Van Leer, A. Sanders, Harkness, R. Miranda,

27   /////

28   /////

                                          1

1   unknown Clark (hereinafter J. Clark),[1] and Dangler[2] arising out of plaintiff's placement in

2   administrative segregation between October 6, 2009, and May 26, 2010. Id. at 6, 13, ¶¶ 24, 92.[3]

3   According to the complaint, plaintiff was placed in administrative segregation as a result of his

4   alleged membership or association with the "2-5" disruptive group. Id. at 6, ¶ 26.

5          In Count I, plaintiff alleged that defendants McDonald, D. Clark,[4] Chapman, Kernan, and

6   Dangler violated his First Amendment rights by deliberately interfering with his administrative

7   grievances, thereby denying him access to the courts. Id. at 19, ¶ 149.

8          Count II alleged that defendants McDonald, Davey, Cate, Sanders, Van Leer, Chapman,

9   and Kernan violated his First Amendment rights by burdening his practice of his sincere Christian

10  faith without a legitimate penological reason. Id. at 20, ¶ 150. Plaintiff alleged that he was not

11  allowed to participate in religious activities or services or to speak with a religious advisor. Id. at

12  15-16, 18, ¶¶ 119, 126, 141.

13         Count III alleged that defendants McDonald, Davey, Cate, Van Leer, and Sanders violated

14  his Eighth Amendment rights by depriving him of any outdoor exercise from October 6, 2009,

15  through May 31, 2010. Id. at 20, ¶ 151.

16         Count IV alleged that defendants McDonald, Davey, Van Leer, and Sanders violated his

17  Eighth Amendment rights by subjecting him to extreme cold for a prolonged period of time. Id.,

18  ¶ 152. Plaintiff alleged that between October 6, 2009, and November 20, 2009, he was not

19  provided with sheets or blankets or any clothing other than boxer shorts despite the extremely

20  cold temperatures in his cell. Id. at 10-11, ¶¶ 58, 64-67, 73, 74.

21  /////

22

23  [1]  "Unknown" Clark was ultimately identified as J. Clark. ECF No. 21.

24  [2]  Defendant Dangler was not identified in plaintiff's list of defendants (ECF No. 1 at 3-4), but
    was identified as a defendant later in the complaint (id. at 19, ¶ 149).

25  [3]  References to page numbers in filed documents reflect the court's electronic pagination, not the
    page numbers designated by the parties on the original documents.

26  [4]  Plaintiff did not specify which defendant Clark he was referring to in Count I (ECF No. 1 at 19,
    ¶ 149), but D. Clark was identified as a correctional counselor who was responsible for

27  classification and was also an appeals coordinator (id. at 3, ¶ 12) while J. Clark was identified as
    a nurse (id. at 4, ¶ 17). Given the allegations it is clear the intended defendant was D. Clark.

28

1    Count V alleged that defendants McDonald, Davey, Van Leer, and Sanders violated

2    plaintiff's Eighth Amendment rights by depriving him of essential hygiene items.  Id. at 20, ¶

3    153.  Specifically, he claims that he was denied soap, toilet paper, toothpaste, and a toothbrush

4    between October 6, 2009, and October 10, 2009.  Id. at 10-11, ¶¶ 58, 62, 68.  He also alleged that

5    defendants J. Clark and Miranda violated his Eighth Amendment rights by denying him timely

6    medical care despite being aware of the pain he was suffering.  Id. at 20, ¶ 153.

7    Count VI alleges that defendants McDonald, Davey, Cate, Sanders, Van Leer, and Gower

8    violated plaintiff's Fourteenth Amendment rights when they placed him in administrative

9    segregation without providing him with the required due process.  Id. at 20, ¶ 154.  Defendants

10    allegedly placed him in administrative segregation without providing him with a hearing,

11    information about the charges or reason for segregation, or an opportunity to present a response.

12    Id. at 6, 10, ¶¶ 25, 59.  He was also denied periodic reviews of his placement in segregation.  Id.

13    at 6, ¶ 25.

14    Count VII alleges that defendants McDonald, Gower, Davey and Sanders violated his

15    Fourteenth Amendment due process rights by failing to provide him with meaningful notice that

16    he was under consideration for gang member validation.  Id. at 6-7, 21, ¶¶ 27, 155.  Plaintiff

17    alleges that the defendants failed to provide notice that he had been designated as being an active

18    gang member or associate, notice of the evidence relied on to make that determination, a hearing

19    before the classification committee, advance notice of the hearing, and an opportunity to express

20    his views regarding his proposed validation.  Id.

21    Count VIII alleges that defendants McDonald, Gower, Davey, Van Leer, D. Clark,[5]

22    Chapman, and Sanders violated plaintiff's Fourteenth Amendment right to equal protection when

23    they treated him differently than other similarly classified inmates, other inmates in

24    administrative segregation for investigation, and other inmates placed in disciplinary segregation

25    for misconduct.  Id. at 21-22, ¶ 156.

26    _____

[5]  Plaintiff did not specify which defendant Clark he was referring to in Count VIII (ECF No. 1 at
27    21-22, ¶ 156), but given the allegations relating to classification, it is clear the intended defendant
was D. Clark.

28

3

1    Count IX alleges that defendants McDonald, Gower, Clark,[6] Kernan, Sanders, Van Leer,

2    and Davey conspired to deprive him of his constitutional rights in violation of 42 U.S.C. § 1985.

3    Id. at 22, ¶ 157.

4    Count X alleges that all named defendants violated plaintiff's state law rights, including

5    his rights to due process; free exercise of religion; and to be free from cruel and unusual

6    punishment, retaliation, and indifference to serious medical conditions.  Id., ¶ 158.

7    II.    Procedural History

8    On September 14, 2011, the complaint was screened by the previously assigned

9    magistrate judge who found that it stated "a colorable claim for relief against defendants

10   McDonald, Gower, Davey, Van Leer, Sanders, Miranda and Clark."  ECF No. 9 at 3.  The order

11   did not specify which defendant Clark the complaint stated a claim against.  The court found that

12   plaintiff had stated claims for (1) inadequate medical care; (2) violations of due process to the

13   extent that plaintiff's alleged conditions of confinement during the modified program were

14   imposed without any procedural safeguards and "imposed a 'freedom from restraint' that

15   'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of

16   prison life;" (3) deprivation of outdoor exercise for a period of eight months; and (4) denial of

17   participation in religious activities for an eight-month period.  Id. at 4.  The court also

18   acknowledged an Eighth Amendment conditions of confinement claim related to plaintiff being

19   subject to extremely cold temperatures his first two nights in segregation and having only boxer

20   shorts and shower shoes from October 6 to November 20, 2009.  Id.

21   The claims against defendants Cate, Kernan, Chapman, Harkness, and Dangler were

22   dismissed (id. at 7) and the court later confirmed that plaintiff's cognizable due process claims

23   did not include "claims associated with plaintiff's allegations related to gang validation" (ECF

24   No. 96 at 14, n.8 (citing ECF No. 9 at 4)).  The screening order made no mention of plaintiff's

25   claims for violation of his First Amendment right to access the courts (Count I [ECF No. 1 at 19,

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6]  It is not clear which defendant Clark plaintiff intended to bring this claim against, but given the
     other defendants named in this count plaintiff likely intended to name D. Clark.

28

4

1    ¶ 149]), violation of his Fourteenth Amendment equal protection rights (Count VIII [ECF No. 1

2    at 21-22, ¶ 156]), conspiracy to deprive him of his constitutional rights in violation of 42 U.S.C. §

3    1985 (Count IX [ECF No. 1 at 22, ¶ 157]), and violation of his state law rights (Count X [ECF

4    No. 1 at 22, ¶ 158]).  ECF No. 9.

5             Plaintiff was given the option of amending the complaint or proceeding against defendants

6    McDonald, Gower, Davey, Van Leer, Sanders, Miranda, and Clark without amending the

7    complaint.  Id. at 6-7.  Plaintiff opted to proceed with the complaint rather than file an amended

8    complaint.  ECF No. 12.  Service was ordered on defendants McDonald, Gower, Davey, Van

9    Leer, Sanders, Miranda, and Clark (ECF No. 13) and defendants Cate, Kernan, Chapman,

10   Harkness, and Dangler were dismissed (ECF No. 17).

11            After service of the complaint, defendant J. Clark moved for clarification of the screening

12   order (ECF No. 9) and the order and findings and recommendations that ordered service on some

13   defendants while recommending dismissal of others (ECF No. 13).  ECF No. 21.  Defendant J.

14   Clark sought to clarify which defendant Clark the court found the complaint stated cognizable

15   claims against.  Id.  The court granted the motion and clarified that the complaint proceeded

16   against defendant J. Clark and recommended that defendant D. Clark be dismissed.  ECF No. 24.

17   No objections were filed and D. Clark was dismissed.  ECF No. 31.

18            Defendant Miranda filed a motion to dismiss for failure to state a claim (ECF No. 29) and

19   defendants J. Clark, Davey, Gower, McDonald, Sanders, and Van Leer filed a motion to dismiss

20   for failure to exhaust administrative remedies (ECF No. 30).[7]  Defendant Miranda joined in the

---

21   [7] This matter was resolved prior to the Ninth Circuit's decision in Albino v. Baca, which requires

22   that questions of administrative exhaustion be decided pursuant to motions for summary
     judgment.  747 F.3d 1162, 1166 (9th Cir. 2014).  Although the exhaustion issue was decided on a

23   motion to dismiss, which was appropriate at the time of disposition, defendants submitted their
     supporting evidence, and plaintiff was advised of the importance of responding to the motion and

24   presenting his own supporting evidence (ECF No. 39), just as would have occurred on a motion
     for summary judgment.  The court found that the exhausted appeal put forth by plaintiff did not

25   raise issues of unsafe confinement and he did not make any showing of filing grievances
     regarding the exhaustion of grievances related to temperature or clothing.  ECF No. 48 at 17.

26   Plaintiff did not object to the findings and recommendations, which were adopted by the District
     Judge.  ECF No. 49.  No facts were in dispute so there is no need for further factual development

27   on the exhaustion issue.  Accordingly, Albino does not affect the decision in this case.  See

28   (continued)

1    other defendants' motion to dismiss.  ECF No. 36.  The case was reassigned to the undersigned

2    (ECF No. 47), who recommended that defendant Miranda's motion to dismiss be granted (ECF

3    No. 48).  The motion to dismiss defendant Miranda was granted without prejudice to amendment

4    and plaintiff was granted twenty-eight days to file an amended complaint.  ECF No. 49.  Plaintiff

5    did not amend the complaint and defendant Miranda was dismissed from this action.  ECF No.

6    52.  Defendants J. Clark, Davey, Gower, McDonald, Sanders, and Van Leer's motion to dismiss

7    was granted only as to plaintiff's claim that his "Eighth Amendment rights were violated by

8    exposure to extreme cold without adequate clothing and/or linens" (Count IV [ECF No. 1 at 20, ¶

9    152]).  ECF No. 49.  In analyzing the motion to dismiss, the court noted that plaintiff had

10   exhausted an appeal regarding his loss of canteen privileges, which "could be relevant to the

11   claim that defendants deprived plaintiff of toiletries necessary to basic hygiene, which is an aspect

12   of the alleged Eighth Amendment violation" (ECF No. 48 at 11, n.3), though this claim had not

13   previously been acknowledged (ECF No. 9 at 3-4).

14          Upon disposition of the motions to dismiss, the following claims remained: (1) Count II

15   against defendants McDonald, Davey, Sanders, and Van Leer for violating plaintiff's First

16   Amendment rights by preventing him from practicing his religion; (2) Count III against

17   defendants McDonald, Davey, Van Leer, and Sanders for depriving plaintiff of outdoor exercise

18   for a period of nearly eight months; (3) Count V against defendant J. Clark for being deliberately

19   indifferent to plaintiff's serious medical need; and (4) Count VI against defendants McDonald,

20   Davey, Sanders, Van Leer, and Gower for placing plaintiff in administrative segregation without

21   the required due process.

22          Plaintiff and defendants J. Clark, Davey, Gower, McDonald, Sanders, and Van Leer filed

23   motions for summary judgment.  ECF Nos. 64, 65.  Plaintiff's motion was denied (ECF No. 102),

24   and defendants' motion is currently pending.

25   /////

26

27   McBride v. Lopez, 791 F.3d 1115, 1118 (9th Cir. 2015) (Albino does not affect decision where
     there is no need for further factual development).

28

6

1    III.    Failure to State a Claim

2          Plaintiff's First Amendment access to the courts, Eighth Amendment conditions of

3    confinement (sanitation), Fourteenth Amendment equal protection, conspiracy, and state law

4    claims were not acknowledged in the screening order, nor were they explicitly dismissed.  See

5    ECF No. 9.  Therefore, before discussing defendants' motion for summary judgment, the court

6    will explain why each of these counts should be dismissed for failure to state a claim.

7          A.    Count I: First Amendment (Access to the Courts)

8          In the complaint, plaintiff alleges that defendant McDonald[8] violated his First Amendment

9    right to access the courts by "deliberately and/or constructively interfering with his administrative

10   grievances thus denying him adequate and effective court access."  ECF No. 1 at 19, ¶ 149.  In

11   recommending dismissal of defendant D. Clark, the court addressed why Count I failed to state a

12   claim against D. Clark.  ECF No. 24 at 3-6.  For the same reasons Count I failed to state a claim

13   against D. Clark, it fails to state a claim against defendant McDonald, and Count I against

14   defendant McDonald should be dismissed.

15         B.    Count V: Eighth Amendment (Sanitation)

16         Though not mentioned in the screening order, the court later indicated that plaintiff's

17   conditions of confinement claim also encompassed the alleged deprivation of toiletries necessary

18   to basic hygiene (ECF No. 1 at 20, ¶ 153).  ECF No. 48 at 11, n.3.  However, plaintiff's

19   conditions of confinement claim against defendants McDonald, Davey, Van Leer, and Sanders

20   fails to state a claim.

21         "The Constitution does not mandate comfortable prisons, but neither does it permit

22   inhumane ones."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks and

23   citation omitted).  A prison official violates the Eighth Amendment only when two requirements

24   are met.  Id. at 834.  "First, the deprivation alleged must be, objectively, sufficiently serious, a

25   prison official's act or omission must result in the denial of the minimal civilized measure of

26

27   _____

     [8]  As noted above in Section II, defendants D. Clark, Chapman, Kernan, and Dangler have already
     been dismissed from the case.

28

1   life's necessities." Id. (internal quotation marks and citations omitted).  Second, the prison

2   official must subjectively have a sufficiently culpable state of mind, one of deliberate indifference

3   to inmate health or safety.  Id.  The official is not liable under the Eighth Amendment unless he

4   knows of and "disregards an excessive risk to inmate health or safety; the official must both be

5   aware of facts from which the inference could be drawn that a substantial risk of serious harm

6   exists, and he must also draw the inference." Id. at 837.  Then he must fail to take reasonable

7   measures to abate the substantial risk of serious harm.  Id. at 847.  Mere negligent failure to

8   protect an inmate from harm is not actionable under § 1983.  Id. at 835-36.

9        Although prison conditions may be restrictive and harsh, Rhodes v. Chapman, 452 U.S.

10   337, 347, (1981), prison officials must provide prisoners with food, clothing, shelter, sanitation,

11   medical care, and personal safety, Wright v. Rushen, 642 F.2d 1129, 1132-33 (9th Cir. 1981)

12   (citing Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978)).  "What is necessary to show sufficient

13   harm for purposes of the Cruel and Unusual Punishment Clause depends upon the claim at issue."

14   Hudson v. McMillian, 503 U.S. 1, 8 (1992).  "The objective component of an Eighth Amendment

15   claim is therefore contextual and responsive to 'contemporary standards of decency.'"  Id.

16   (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  "[E]xtreme deprivations are required to

17   make out a[n] [Eighth Amendment] conditions-of-confinement claim." Id. at 9.  With respect to

18   this type of claim, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay

19   for their offenses against society, only those deprivations denying the minimal civilized measure

20   of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."

21   Id. (internal quotation marks and citations omitted).

22        While the Eighth Amendment guarantees sanitation, Wright, 642 F.2d at 1132-33,

23   including personal hygiene supplies such as soap and toothpaste, Keenan v. Hall, 83 F.3d 1083,

24   1091 (9th Cir. 1996), temporarily substandard conditions of confinement do not rise to the level

25   of constitutional violations, see Anderson v. County of Kern, 45 F.3d 1310, 1314 (9th Cir. 1995);

26   Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982) (court may consider time prisoners go

27   without benefits, the longer the deprivation, the more likely there will be an "unwarranted

28   infliction of pain"), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472, (1995).

8

> *Some* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes.   Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.

Wilson v. Seiter, 501 U.S. 294, 304 (1991) (emphasis in original).

First, plaintiff's allegations related to the deprivation of hygiene items fail to state a claim because plaintiff has failed to allege any facts that would demonstrated that McDonald, Davey, Van Leer, or Sanders were aware of the deprivation.  There is no indication that any of these individuals were responsible for or prevented the distribution of hygiene items.  Nor are there any facts that would demonstrate that any of these individuals was advised of the deprivation either through the appeals process or some other form of communication.  The complaint alleges that hygiene items were requested from "building staff," but does not identify any of the defendants as the "building staff" to whom requests were made.  If defendants were not aware of the deprivation, they would be unable to form the requisite intent to be liable under the Eighth Amendment.  However, even if plaintiff could amend the complaint to allege sufficient facts to show defendants were aware of the deprivation of hygiene items, the claim still fails because the deprivation was not "objectively, sufficiently serious."

In this case, plaintiff alleges that he was denied soap, toilet paper, toothpaste, and a toothbrush between October 6, 2009, and October 10, 2009.  ECF No. 1 at 10-11, ¶¶ 58, 62, 68. Plaintiff's deprivation of soap, toilet paper, toothpaste, and a toothbrush for four days does not rise to the level of an Eighth Amendment violation.  See Murillo v. Bueno, No. 1:12-cv-00095-LJO-DLB PC, 2013 WL 1731393, at *1-2, 2013 U.S. Dist. LEXIS 57710, at *3-7 (E.D. Cal. Apr. 20, 2013, adopted in full May 17, 2013) (prisoner not provided with toothbrush, toothpaste, soap, toilet paper, or deodorant for approximately five days while housed in holding cell failed to state a claim); Lopez v. Cate, No. 1:10-cv-01773-AWI-SKO PC, 2013 WL 239097, at *8, 2013 U.S.

9

1   Dist. LEXIS 8630, at *22-23 (E.D. Cal. Jan. 22, 2013, adopted in full Mar. 19, 2013[9])

2   (deprivation of toilet paper, toothbrush, and toothpowder for approximately seven days does not

3   rise to level of Eighth Amendment violation); Harris v. Fleming, 839 F.2d 1232, 1234-35 (7th

4   Cir. 1988) (depriving prisoner of toilet paper for five days and soap, toothpaste and toothbrush for

5   ten days while housing him in filthy, roach-infested cell was not a constitutional violation);

6   Williams v. Delo, 49 F.3d 442, 444-45 (8th Cir. 1995) (placement in strip cell without water,

7   mattress, a toothbrush, toothpaste, deodorant, soap, sheets, blankets, pillow cases, pillows, his

8   legal mail and/or clothing, for four days did not violate Eighth Amendment).

9          Though some cases have found an Eighth Amendment claim where the deprivations

10   included the failure to provide soap, toilet paper, toothpaste, and a toothbrush, those cases are

11   distinguishable from the instant case because the deprivations alleged included additional

12   deprivations, such as inadequate heat[10] or no access to water.  Holloway v. Cohen, 61 F. App'x.

13   435, 436-37 (9th Cir. 2003) (four day deprivation of clothing, mattress, additional blankets, toilet

14   paper, and ability to shower while vents blew cold air into cell night and day sufficient to state a

15   claim (citing Wilson, 501 U.S. at 304, for principle that low cell temperature combined with

16   failure to issue blankets may establish Eighth Amendment violation));[11] Johnson v. Runnels, No.

17   2:04-cv-776-LKK-EFB P, 2013 WL 3940884, at *10-11, 2013 U.S. Dist. LEXIS 106783, at *33-

18   34 (E.D. Cal. July 30, 2013, adopted in full Dec. 13, 2013[12]) (approximately nine day deprivation

19   of sufficiently warm cell, sufficient clothing, sanitary bedding, hygiene items, showers, and

20   medical slips states a claim, but noting that "deprivation of hygiene items and showers may not

21   alone have been serious enough to violate the Eighth Amendment due to the short time period

22   ─────────────────────
[9]  2013 WL 1151980; 2013 U.S. Dist. LEXIS 38115.

23   [10]  Plaintiff's allegations regarding inadequate heat were previously dismissed as unexhausted.
     ECF No. 49.

24   [11]  Because deprivations of warmth and sanitation do not "have a mutually enforcing effect that
     produces the deprivation of a single, identifiable human need," they cannot be combined to

25   constitute "overall conditions" that are unconstitutional.  Wilson, 501 U.S. at 304-305.  Therefore,
     the court's citation to Wilson indicates that the conditions that stated a claim were those related to

26   the denial of adequate heat, especially in consideration of the cases finding no claim where only
     allegations related to sanitation existed.

27   [12]  2013 WL 6576044; 2013 U.S. Dist. LEXIS 175360.

28

1   involved"); Conley v. Mahoney,[13] No. CV 08-19-H-DWM-RKS, 2008 WL 5435336, at *4 (D.

2   Mont. May 1, 2008) (deprivation of clothing, bedding, toilet paper, running water, and ability to

3   shower for eight days  in cold unsanitary conditions states a claim).

4          There are no allegations that plaintiff was deprived of running water, that his living

5   conditions were otherwise unsanitary, or that he suffered any harm from the deprivations he did

6   allege.  The short-term deprivation suffered by plaintiff is therefore insufficient to state a claim.

7   Additionally, plaintiff states that he was able to obtain "a small amount of toilet paper" on

8   October 7, 2009 (id. at 10, ¶ 63), and so was not without toilet paper for the entire four day period

9   at issue.  For these reasons, plaintiff's Eighth Amendment conditions of confinement claim

10   related to the deprivation of hygiene items should be dismissed.

11          C.      Count VIII: Fourteenth Amendment (Equal Protection)

12          The Equal Protection Clause requires the State to treat all similarly situated people

13   equally.  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "To state a claim

14   for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with

15   an intent or purpose to discriminate against him based upon his membership in a protected class."

16   Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).  Prison classifications that burden

17   fundamental rights but are not based on race generally pass constitutional muster if they are

18   "reasonably related" to "legitimate penological interests."  See Johnson v. California, 543 U.S.

19   499, 509-510 (2005) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).  "Gang membership is not

20   a suspect class."  Allen v. Hubbard, No. CV 11-4056-SJO (PJW), 2011 WL 6202910, at *4, 2011

21   U.S. Dist. LEXIS 143164, at *12 (C.D. Cal. Oct. 12, 2011 adopted Dec. 8, 2011); Watt v.

22   Runnels, No. 2:03-cv-01928-JKS-GGH-P, 2007 WL 2898563, at *1 n.1, 2007 U.S. Dist. LEXI

23   72628, at *3 (E.D. Cal. Sept. 28, 2007) (classification by gang membership or affiliation is not

24

25   [13]  In Conley, the District Court for the District of Montana also collected cases where the alleged
conditions of confinement were determined to have stated a claim.  2008 WL 5435336, at *4.

26   Though the majority of the cases cited were cases where the plaintiff stated a claim related to
sanitation, all of the cases are distinguishable from the instant case because in addition to the

27   deprivations alleged here, they also included allegations that the inmates were housed in cells
with pit toilets or no toilets, no access to water or a sink, or both.  Id.

28

1    suspect); Medina v. Gomez, No. C 93-1774 TEH, 1997 WL 488588, at *6, 1997 U.S. Dist.

2    LEXIS 12208, at *19 (N.D. Cal. Aug. 14, 1997) ("[G]ang membership bears none of the

3    'traditional indicia of suspectness.'") (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411

4    U.S. 1, 28 (1973)).

5          Plaintiff alleges that defendants McDonald, Gower, Davey, Van Leer, and Sanders

6    violated his rights by providing "disparate treatment between plaintiff and other prisoners

7    classified as 'A1-A'; other CDCR inmates placed into ASU for investigation into disruptive

8    group/gang investigation; and other prisoners placed in disciplinary segregation for alleged

9    misconduct." ECF No. 1 at 21, ¶ 156. He claims that these classifications burdened his

10   fundamental right to court access by preventing adequate access to the administrative appeals

11   process. Id. at 22, ¶ 156. The imposed segregation was based on his alleged membership or

12   association with the "2-5" gang or disruptive group, which had recently been involved in assaults

13   on other inmates and staff. Id. at 6, ¶ 26.

14         Plaintiff does not allege any racial or other discriminatory bias for his placement in

15   administrative segregation. Nor does he allege that any other inmates that were held in

16   administrative segregation as suspected 2-5 members or affiliates, the most essential defining

17   characteristic of the group, were treated any differently than he was. Though he argues that he

18   was treated differently than other inmates with his A1-A classification score and other inmates in

19   segregation, there is no indication that those other inmates were suspected to be members or

20   affiliates of the 2-5 disruptive group or otherwise suspected of being involved in the kind of

21   large-scale, violent disruption that was the focus of the 2-5 investigation. "Similarly situated"

22   persons are those "who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10

23   (1992). There is nothing to show that these other groups of inmates were similarly situated to

24   plaintiff beyond a single over-lapping factor of classification score or segregation status.

25         Plaintiff's allegations of equal protection violations are no more than due process claims

26   of "atypical and significant hardship." In fact, plaintiff highlights the differences between the

27   conditions he was subject to and those of other inmates in various classification groups under the

28   heading "Atypical and Significant Hardship/Major Disruption in Environment." ECF No. 1 at 14.

1    The undersigned finds nothing in plaintiff's complaint that would, if true, support a cause of

2    action for violation of plaintiff's right to equal protection against any defendant.

3            D.        Count IX: Conspiracy

                       To state a cause of action under § 1985(3), a complaint must allege
4                      (1) a conspiracy, (2) to deprive any person or a class of persons of
5                      the equal protection of the laws, or of equal privileges and
                       immunities under the laws, (3) an act by one of the conspirators in
6                      furtherance of the conspiracy, and (4) a personal injury, property
7                      damage or a deprivation of any right or privilege of a citizen of the
                       United States.

8

9    Gillespie v. Civiletti, 629 F.2d 637, 641 (9th Cir. 1980) (citing Griffin v. Breckenridge, 403 U.S.

10   88, 102-103 (1971)).  "[T]here must be some racial, or perhaps otherwise class-based, invidiously

11   discriminatory animus behind the conspirators' action."  Griffin, 403 U.S. at 102.  To state a

12   claim under § 1985(3) for a non-race-based class, the Ninth Circuit requires "'either that the

13   courts have designated the class in question a suspect or quasi-suspect classification requiring

14   more exacting scrutiny or that Congress has indicated through legislation that the class required

15   special protection.'"  Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting

16   Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir. 1985)).  "[T]he absence of a section 1983

17   deprivation of rights precludes a section 1985 conspiracy claim predicated on the same

18   allegations."  Caldeira v. County of Kauai, 866 F.2d 1175, 1182 (9th Cir. 1989) (citing Cassettari

19   v. Nevada County, 824 F.2d 735, 739 (9th Cir. 1987)).

20           Here, plaintiff's allegations of a conspiracy fail to state a claim upon which relief may be

21   granted.  There are no facts to support that there was a race-based, discriminatory motive behind

22   defendants' actions, that plaintiff is a member of a suspect or quasi-suspect class, or that he is part

23   of a class that Congress has indicated requires special protection.  While prisoners can be

24   members of a protected class by virtue of their race, religion, or other recognized protected status,

25   the fact that plaintiff is a prisoner does not itself qualify him as a member of a protected class.

26   Webber v. Crabtree, 158 F.3d 460, 461 (9th Cir. 1998); see also Pryor v. Brennan, 914 F.2d 921,

27   923 (7th Cir. 1990) ("Prisoners do not constitute a suspect class."); Moss v. Clark, 886 F.2d 686,

28   690 (4th Cir. 1989) ("The status of incarceration is neither an immutable characteristic, nor an

                                                      13

1  invidious basis of classification.").  Nor is there authority to find that inmates classified as "A1-

2  A," inmates in administrative segregation for investigation, or inmates placed in disciplinary

3  segregation for misconduct (ECF No. 1 at 21, ¶ 156) are part of a suspect or quasi-suspect class.

4          Additionally, there is absolutely no indication of any agreement between any of the

5  defendants.  Mere joint employment by the California Department of Corrections and

6  Rehabilitation is insufficient to establish the common objective required for a conspiracy.

7  Finally, as set forth below in Section VIII, the undersigned recommends that defendants' motion

8  for summary judgment be granted, thereby dismissing plaintiff's remaining claims under § 1983.

9  Plaintiff's claim for conspiracy under § 1985 cannot survive without a cognizable claim under §

10  1983.  For these reasons, plaintiff's § 1985 conspiracy claim should be dismissed.

11          E.      Count X: State Law Claims

12          Subject to the conditions set forth in 28 U.S.C. § 1367(c), district courts may decline to

13  exercise supplemental jurisdiction over state law claims.  Acri v. Varian Associates, Inc., 114

14  F.3d 999, 1000 (9th Cir. 1997) (en banc).  The court's decision whether to exercise supplemental

15  jurisdiction should be informed by values of "economy, convenience, fairness, and comity."  Id.

16  at 1001 (citations omitted).  Further, primary responsibility for developing and applying state law

17  rests with the state courts.  Therefore, when federal claims are eliminated before trial, district

18  courts should usually decline to exercise supplemental jurisdiction.  Carnegie-Mellon Univ. v.

19  Cohill, 484 U.S. 343, 350 (1988); Gini v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1046 (9th

20  Cir. 1994) ("[I]n the usual case in which federal-law claims are eliminated before trial, the

21  balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state

22  law claims.") (quoting Schneider v. TRW Inc., 938 F.2d 986, 993 (9th Cir. 1991)).  As outlined

23  below in Section VIII, it is recommended that defendants' motion for summary judgment be

24  granted and the remaining federal-law claims be dismissed.  The undersigned therefore

25  recommends that the court decline to exercise supplemental jurisdiction over plaintiff's state law

26  claims.

27  /////

28  /////

1    IV.    Defendants' Summary Judgment Motion

2          Defendants J. Clark, Davey, Gower, McDonald, Sanders, and Van Leer move for

3    summary judgment on the grounds that defendants Davey, Gower, Sanders, and Van Leer did not

4    have authority to begin, end, or adjust the modified program[14] (ECF No. 65-1 at 10, 29-30) and

5    that plaintiff was not entitled to procedural protections when he was placed on modified program

6    (id. at 10, 30-32).  Defendants Davey, Gower, McDonald, Sanders, and Van Leer also argue that

7    they did not violate plaintiff's First or Eighth Amendment rights because the restrictions in place

8    during the modified program were reasonable and related to a legitimate penological interest.  Id.

9    at 10, 32-39.  Defendant J. Clark argues that he was not deliberately indifferent to plaintiff's

10   medical needs because plaintiff did not have a serious medical need and defendant Clark provided

11   plaintiff with appropriate treatment.  Id. at 10, 39-42.  Finally, all defendants argue that they are

12   entitled to qualified immunity.  Id. at 10, 42-44.

13   V.    Plaintiff's Opposition

14          It is well-established that the pleadings of pro se litigants are held to "less stringent

15   standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520 (1972)

16   (per curiam).  Nevertheless, "[p]ro se litigants must follow the same rules of procedure that

17   govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), overruled on other

18   grounds, Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc).  However, the

19   unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they are

20   subject to the "handicaps . . . detention necessarily imposes upon a litigant," such as "limited

21   access to legal materials" as well as "sources of proof."  Jacobsen v. Filler, 790 F.2d 1362,

22   1364-65 & n.4 (9th Cir. 1986).  Inmate litigants, therefore, should not be held to a standard of

23   _____
     [14]  Though defendants introduce the argument regarding authority to control the modified
24   program as covering defendants Davey, Gower, Sanders, and Van Leer, the argument itself
     addresses only defendants Sanders and Van Leer.  ECF No. 65-1 at 10, 29-30.  With respect to
25   defendants Davey, Gower, and Van Leer, absent a claim that they made recommendations that
     were not followed (e.g. allowing 2-5 members outdoor exercise or religious group activities), this
26   argument is without merit in light of their duties to keep McDonald apprised of the status of the
     investigation and recommend subsequent action and McDonald's reliance on their reports and
27   recommendations (DSUF ¶¶ 6-7, 11-12, 19, 23-24).  No such claim has been made here.

28

1    "strict literalness" with respect to the requirements of the summary judgment rule.  Id.

2           The court is mindful of the Ninth Circuit's more overarching caution in this context, as

3    noted above, that district courts are to "construe liberally motion papers and pleadings filed by

4    pro se inmates and . . . avoid applying summary judgment rules strictly."  Thomas v. Ponder, 611

5    F.3d 1144, 1150 (9th Cir. 2010).  Accordingly, though plaintiff has largely complied with the

6    rules of procedure, the court will consider the record before it in its entirety.  However, only those

7    assertions in the opposition which have evidentiary support will be considered.

8           Plaintiff's opposition argues that the defendants' motion for summary judgment should be

9    denied because there was no credible evidence that he was a 2-5 member, the restrictions placed

10   on him during the modified program were unnecessary, he did have a serious medical need that

11   defendant Clark was deliberately indifferent to, and defendants are not entitled to qualified

12   immunity.

13   VI.    Undisputed Material Facts[15]

14          A.     Plaintiff's Objections

15          Plaintiff objects to Defendants' Statement of Undisputed Facts (DSUF) [ECF No. 93] ¶¶

16   31-40, 56, 70-71, 87-94, 101-02, 121, 126-28, 135, 139-40, 154-56, 163, 170, and 172 on the

17   grounds that they are irrelevant or immaterial to disposition of the motion for summary judgment,

18   but does not dispute the facts asserted.  Response to DSUF [ECF No. 98].[16]  To the extent these

---

[15]  As a result of the court's denial of their first motion to file documents under seal, defendants moved to file an amended statement of facts to reflect the reorganization and renumbering of their exhibits.  ECF No. 74.  The motion was granted (ECF No. 75) and defendants filed a first amended statement of facts (ECF No. 76).  When the court partially granted defendants second motion to file documents under seal, they were given the option of providing the exhibits not approved for filing under seal or filing a second amended statement of facts that omitted reference to those exhibits.  ECF No. 81.  Defendants filed a second amended statement of facts.  ECF No. 82.  However, due to deficiencies in the second amended statement of facts, defendants were ordered to file a third amended statement of facts and plaintiff was afforded an opportunity to file a response to the amended statement of facts.  ECF No. 91.  Defendants' third amended statement of facts (ECF No. 93) is the operative statement of facts and is supported by a set of amended exhibits (ECF No. 77).

[16]  Based on the page numbers provided by plaintiff, his response to defendants' third amended statement of facts is missing pages twenty-five and thirty-one.  ECF No. 98.  Upon inspection, page twenty-six continues on from page twenty-four and so it appears plaintiff simply mis-
(continued)

1  facts are relied on below, the court overrules plaintiff's objections and deems the facts

2  undisputed.  The facts objected to are both relevant and material for the context they provide or

3  because they show what defendants knew or believed at the time.

4       Plaintiff also objects to, without disputing the contents of, DSUF ¶¶ 75, 86, 100, 103-04,

5  116, 122-28, 157, 160, and 171 because they are inadmissible hearsay and the evidence does not

6  support the fact asserted.  Response to DSUF.  The court has reviewed the evidence relied on and

7  finds that the facts are sufficiently supported and that the supporting evidence falls under

8  exceptions to the hearsay rule, see Fed. R. Evid. 803(6), (8), or is a declaration where the

9  declarant is an individual able to testify to the facts based upon his personal knowledge or

10  experience.  Additionally, to the extent the evidence is presented to show what defendants knew

11  or believed at the relevant time, it is not hearsay because it is not offered for the proof of the

12  matter asserted.  These objections are therefore overruled and the facts are deemed undisputed.

13       Finally, plaintiff's objections to DSUF ¶¶ 99 and 117on the grounds that he should have

14  been provided with the supporting evidence are overruled.  The court has already determined the

15  documents were properly submitted under seal.  Since plaintiff does not dispute the accuracy of

16  the facts, they are deemed undisputed.

17       The following material facts are undisputed except as noted.

18       B.    Summary of the 2-5 Modified Program

19       On September 17, 2009, three inmates associated with the 2-5 group (commonly referred

20  to as "the 2-5") assaulted three other inmates in two violent assaults that were coordinated to take

21  place at the same time at opposite ends of the B-Facility main exercise yard at High Desert State

22  Prison (HDSP).  DSUF ¶¶ 99-100.  The assaults followed a string of violent incidents on B-

23  _____

24  numbered his pages in this instance.  However, page thirty-two does not continue from page
thirty, and it appears that plaintiff did in fact leave out page thirty-one.  As a result, plaintiff's

25  responses to facts 97-100 were not included in the response.  Id. at 29-30.  Because facts 97-99
are identical and fact 100 is substantively identical, to the extent the court considers any of these

26  facts material, it has relied on the objections plaintiff made to those facts in his response to
defendants' second amended statement of facts (ECF No. 86 at 29-30) in determining whether a

27  dispute exists.  Where the evidentiary basis for the fact has changed, the court has considered
whether the fact is appropriately supported by the evidence cited.

28

1   Facility that were determined to be part of a coordinated effort by the 2-5 to murder or remove

2   sex offenders from B-Facility.  DSUF ¶¶ 85-95.  Though not officially recognized as a prison

3   gang or disruptive group at the time of the incidents, the violence on B-Facility during 2009 led to

4   efforts to officially designate the 2-5 a gang or disruptive group and the 2-5 are currently

5   identified as a Security Threat Group II.  DSUF ¶¶ 96-98.[17]

6         The assaults on September 17, 2009, resulted in all inmates on B-Facility being placed on

7   modified programming on September 18, 2009.  DSUF ¶ 105.  On October 6, 2009, all inmates

8   believed to be associates or members of the 2-5 were isolated from the rest of the inmates on B-

9   Facility and placed on a more restrictive modified program.  DSUF ¶¶ 110, 115, 119-20.  Plaintiff

10  was one of the inmates identified as being a possible member or associate of the 2-5 and was

11  subject to the more restrictive modified program until he was returned to normal programming on

12  May 25, 2010.  DSUF ¶¶ 118, 190.  The specifics of the events leading to the implementation of

13  the modified program, the conditions of the modified program, and the efforts to return to normal

14  programming are outlined in further detail below.

15        C.      The Parties (DSUF ¶¶ 1-30)

16        At all times relevant to the complaint, plaintiff was an inmate in the custody of the

17  California Department of Corrections and Rehabilitation (CDCR) and housed at High Desert

18  State Prison HDSP, B-Facility.  DSUF ¶¶ 1-2, 118.[18]

19        At all times relevant to the complaint, defendant McDonald was either the acting warden

20  or warden of HDSP.  DSUF ¶ 3.  McDonald had the sole authority to begin, end, and adjust the

21  terms of the modified program that was implemented on September 18, 2009 (2-5 modified

22  program).  DSUF ¶ 5.  McDonald was not personally involved in conducting the investigation

23  into the incidents that triggered the 2-5 modified program and instead relied upon the

24

25  [17] Plaintiff's objections to DSUF ¶¶ 96-98 are overruled.  The facts are supported by defendant
26  McDonald's declaration and are within the realm of his personal knowledge as warden at the
    time.

27  [18] A citation to only defendants' undisputed facts means that plaintiff has explicitly identified a
    fact as undisputed or the court has already deemed the fact undisputed as noted in this order.

28

investigations, analysis, and opinions of his staff.  DSUF ¶¶ 6-7.[19]  The information relied on by McDonald in making his decisions included, but was not limited to, the status of any ongoing investigations, the evidence collected, the effectiveness of the restrictions imposed as part of the modified program, the likelihood that violence would occur without the restrictions in place, the appropriateness of the scope of the restrictions, and the prospects and timetable for a phased unlock to return to normal programming.  DSUF ¶ 7.  McDonald also attended numerous weekly threat assessment meetings where prison officials discussed and offered opinions and recommendations on the modified program, the status of the investigation, and the threats to safety and security in B-Facility and the institution generally.  DSUF ¶¶ 8-9.

At all times relevant to the complaint, defendant Gower was the chief deputy warden at HDSP.  DSUF ¶ 10.  As chief deputy warden, Gower was responsible for reviewing the programming recommendations and evidence provided by subordinate staff and evaluating the ongoing need for the 2-5 modified program.  DSUF ¶ 11.  He also attended weekly meetings as part of the Warden's Executive Committee.  DSUF ¶ 12.  Although Gower could have served as McDonald's designee, in which capacity he would have been authorized to begin, end or adjust the terms of a modified program, he was never authorized to act as McDonald's designee for those purposes and all authority remained with McDonald for the duration of the 2-5 modified program.  DSUF ¶¶ 13-16.

From September 18, 2009, through December 22, 2009, defendant Davey was the correctional captain for B-Facility at HDSP.  DSUF ¶ 17.  He was promoted on December 22, 2009, at which point he transferred to Complex II at HDSP and no longer had any involvement with the 2-5 modified program.  DSUF ¶¶ 18, 20-21.  While Davey was the B-Facility captain, he was a member of the warden's executive committee, consulted with McDonald and other members of the committee regarding the 2-5 modified program, and provided McDonald daily briefings regarding the status of the modified program and updates on the investigation as new

---

[19]  Plaintiff states he does not have evidence that would allow him to either admit or deny the facts in DSUF ¶¶ 6-9, 12, 15, 19, and 23 and they are therefore deemed undisputed.

1   intelligence was discovered.  DSUF ¶ 19.

2          At all times relevant to the complaint, defendant Van Leer was the second watch

3   lieutenant for B-Facility at HDSP.  DSUF ¶¶ 22-23.  He was responsible for implementing the

4   warden's policies concerning the 2-5 modified program, attended numerous threat assessment

5   meetings, provided briefing to the B-Facility captain, and drafted memoranda advising McDonald

6   of the status of the investigation and the efforts to return to normal programming.  DSUF ¶¶ 23-

7   25.

8          Defendant Sanders was, at all times relevant to the complaint, a correctional counselor and

9   was assigned as the counselor for the inmates identified as being members or associates of the 2-5

10  disruptive group.  DSUF ¶¶ 26-27.  Sanders did not have any decision-making authority with

11  respect to the 2-5 modified program and did not have authority to alter the status of plaintiff's

12  confinement under the modified program.  DSUF ¶ 28.[20]

13         At all times relevant to the complaint, defendant J. Clark was a registered nurse at HDSP.

14  DSUF ¶ 29.  As a registered nurse, Clark could not prescribe or renew medications.  DSUF ¶ 204.

15         D.     High Desert State Prison and B-Facility (DSUF ¶¶ 31-40)

16         High Desert State Prison is a Level IV, maximum security prison and the majority of

17  inmates housed there are Level IV inmates who pose the greatest threat to institutional safety and

18  security.  DSUF ¶ 31.  Level IV prisons house the most violent and dangerous felons and have a

19  secure perimeter with internal and external armed coverage and housing units with cells that are

20  not adjacent to exterior walls.  DSUF ¶ 32.  B-Facility is self-contained and built around a yard

21  where inmates are allowed to exercise daily unless unusual circumstances require otherwise.

22  DSUF ¶ 34.  B-Facility is a designated sensitive needs yard.  DSUF ¶ 36.  Sensitive needs yards

23  ───────────────────────

24  [20]  Plaintiff purports to dispute DSUF ¶ 28, but his dispute is argumentative and offers no
    evidence to support his position on what Sanders knew and what she could have done with that
    information.  Response to DSUF ¶ 28.  Moreover, he does not dispute that Sanders did not have

25  decision-making authority or authority to alter plaintiff's status.  Id.  Instead he argues that she
    could have assisted him by passing on information to her superiors.  Id.  Therefore, the fact that

26  Sanders did not have decision-making authority or authority to alter plaintiff's status will be
    deemed undisputed and plaintiff's argument that she could have assisted him will be addressed

27  below in Section VIII.D.

28

were established to provide protective housing for inmates that could not safely program on a general population yard.  Id.  Inmates were typically placed on one of these yards for reasons that would make him a target for violence at the hands of other inmates, such as commitment offense, medical needs, age, or being a gang dropout.  Id.  During 2009, B-Facility housed approximately 1,100 sensitive needs inmates.  DSUF ¶ 35.

Despite the intent to provide more protective housing, the sensitive needs yard at HDSP often presented equal or greater problems, including violence, than the general population yards.  DSUF ¶ 37.  Though most inmates on the sensitive needs yard attempted to program non-violently, when tensions arose it was often difficult for staff to manage those tensions.  DSUF ¶ 40.  This was because of the diverse mix of inmates housed on the special needs yard, many of whom were members of rival street and prison gangs and were convicted killers who had previously sworn to kill members of rival gangs or known sex offenders on sight.  DSUF ¶ 38.  Managing tensions on a general population yard was less difficult in many respects because rival gangs on those yards would self-segregate and each gang typically had its own "turf."  DSUF ¶ 39.

E.    Modified Programming

1.    Background (DSUF ¶¶ 41-56)

Normal programming within the prison is optimal.  DSUF ¶ 41.  Normal programming means that the inmates attend work and education programs; have regular visiting, canteen, and telephone privileges; are allowed to attend the law library and religious services; and they are released to the yard for recreation in large groups according to their yard schedules.  Id.  Under CDCR policy, whenever there is a serious incident, the priorities are to (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames.  DSUF ¶ 44.

A modified program typically involves the suspension of various programs or services for a specified group of inmates and/or in a specific portion of a facility.  DSUF ¶ 42.  For example,

21

work and education programs might be suspended; telephone, canteen, or visiting privileges might be restricted; and meals may be delivered to the cells instead of being served in the dining hall.  Id.  Programs and privileges are restored incrementally as the administration deems appropriate, based on concerns of safety and institutional security.  Id.

In contrast to a modified program, a lockdown typically involves the restriction of all inmates to their cells or dormitory beds, the suspension of all programs, and the suspension of all but essential functions.  DSUF ¶ 43.  Lockdowns can be imposed on the entire prison or on a specific facility within the prison and inmate movement is strictly controlled, under close supervision, and generally under escort with mechanical restraints.  Id.  The administration determines whether critical inmate workers in the affected housing units should be permitted to attend their work assignments and inmates are only released on a case-by-case basis.  Id.

During a modified program, the warden communicates with staff and the affected inmate population through periodic reports called program status reports (PSRs).  DSUF ¶ 45.  Part B of each PSR updates all interested parties about the status of the modified program and communicate the warden's plan for returning to normal programming as soon as it is safe to do so.  Id.  Program status reports reflect the warden's instructions for how the modified program is to be implemented, and subordinate staff are not free to deviate from these instructions.  Id.

When there is a threat to institutional safety and security, after the situation stabilizes, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates.  DSUF ¶ 46.  The lockdown committee meets to assess the overall safety and security risk and determines what areas of the prison are affected, which investigations must be conducted, whether to interview staff and inmates, and how to collect relevant evidence.  Id.  If the incident is serious, program activities may be modified or restricted for some or all inmates by (1) declaring a state of emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program.  DSUF ¶ 47.  The lockdown committee submits a recommendation, which could include a request to institute any of the three security measures, to the warden who approves or rejects the recommendation.  DSUF ¶ 48.

At any given time, a facility or housing unit can be operating under more than one modified program, each designed to address a specific security risk.  DSUF ¶ 49.  In the case of the 2-5 modified program, there were two modified programs in place: one affecting suspected 2-5 members and one affecting the remaining population.  Id.

Lockdowns and modified programs are implemented when necessary to maintain safety and security in the prisons and to protect the lives of inmates and staff.  DSUF ¶ 50.  The decision to implement a lockdown or modified program is usually based on numerous situation-specific facts.  Id.  The decisions regarding when to implement a lockdown or modified program, what activities to suspend, and when to return to normal programing are made by evaluating incidents on a case-by-case basis.  DSUF ¶ 51.  Identifying the group of inmates to be subject to modified programming is situation specific and groups are identified with the intention of facilitating investigational tasks without being under or over-inclusive so as to ensure the safety and security of the staff, inmates, and institution as a whole without interrupting the programming of inmates who were not involved.  DSUF ¶ 52.

Policy is to return to normal programing as soon as it is safe to do so and information is gathered regarding the cause of the violence, any significant security breaches, and plans for committing acts of violence so that it can be determined how and when to resume normal programing and avoid further incidents.  DSUF ¶ 53.  Once the inmates that cause the incident have been identified and removed from the general population and the warden determines it is safe to return to normal programming, a phased unlock may begin.  DSUF ¶ 54.  The warden and his staff develop an unlock plan in which inmates are released and privileges are restored in stages.  DSUF ¶ 55.

Typically, during normal programming, inmates assist staff as part of their work assignments, and they are allowed to report to the showers and some medical appointments without an escort.  DSUF ¶ 56.  During a modified program, correctional staff must deliver all meals to each inmate's cell, most work assignments are suspended, inmates must be escorted to showers and medical appointments, and correctional staff are diverted from their regular responsibilities to assist in the investigation of the underlying incident, all resulting in

1   correctional staff having to work overtime hours.  Id.  For these reasons, it is more difficult, labor

2   intensive, and expensive to operate a prison during a modified program.  Id.

3                   2.      Procedures for Investigating an Incident (DSUF ¶¶ 57-62)

4           The implementation of a modified program begins the process of investigating and

5   gathering intelligence, which can be slow, time consuming, and labor intensive.  DSUF ¶ 57.  The

6   prisons, including inmate cells, are searched thoroughly for evidence, weapons and contraband;

7   mail is screened for information regarding planned violence; and evidence and information

8   obtained through searches and interviews is examined and often leads to additional searches and

9   interviews.  DSUF ¶ 58.  The discovery of weapons delays the investigation process because it

10  creates additional issues that must be investigated, such as where the weapons came from, how

11  they were made, when they were gathered, and who their intended target is.  DSUF ¶ 59.  When

12  additional incidents occur during the unlock process, previously restored programs may be

13  rescinded to facilitate investigation of the new incident and the modified program may be

14  continued if a return to normal programming would pose too great of a risk.  DSUF ¶ 60.  The

15  completion of necessary interviews, searches, and investigations can take several weeks or even

16  months and may be extended or delayed if critical information is discovered or leads are

17  developed that require additional investigation or if other incidents occur.  DSUF ¶ 61.  Every

18  inmate within the determined scope of the modified program is subject to investigation even if he

19  was not housed in the housing unit where the incident occurred.  DSUF ¶ 62.

20                  3.      Phased Return to Normal Programming (DSUF ¶¶ 63-69)

21          In order to return to normal programming as soon as it is safe to do so, the warden

22  requests that staff develop an unlock plan for releasing affected inmates back to normal

23  programming.  DSUF ¶¶ 63-64.  Unlock plans are developed on a case-by-case basis based on the

24  underlying incident and the phases for returning to full program activities depend upon the

25  magnitude and dynamics of the incident.  DSUF ¶ 64.  The resumption of normal program

26  activities is planned and implemented during normal business hours when the majority of

27  regularly scheduled staff are present and have been briefed on the plan of operation.  Id.

28          Critical workers are often the first inmates to be released and inmates are initially released

1    in small numbers which increase over time when it is deemed safe to do so.  DSUF ¶ 65.  Once

2    the inmates with priority work assignments have been released, their privileges are restored

3    incrementally.  Id.  The remaining inmates are included in incremental releases and return to full

4    programming.  DSUF ¶ 66.  Typically non-involved groups are released first, followed by those

5    involved in the incident based on their gang and disruptive group affiliations.  Id.  Inmates are

6    released in small groups to the day room and the recreation yard where staff have the opportunity

7    to observe their conduct in a controlled environment and evaluate whether the unlock can proceed

8    safely.  DSUF ¶ 67.  Program activities such as telephone calls, canteen, and quarterly packages

9    are also restored incrementally, but if another incident occurs during the unlock process, inmates

10   that were previously released may be placed back on lockdown so the new incident can be

11   investigated.  DSUF ¶¶ 68-69.

12              4.       Restrictions on Exercise (DSUF ¶¶ 70-74)

13       Of all the programming activities that are suspended during a modified program, it is most

14   difficult to determine when exercise programs can be safely resumed.  DSUF ¶ 70.  Inmates have

15   the greatest access to each other on exercise yards, which is where most assaults occur, and in

16   defendant McDonald's experience, the exercise yard is where violence is most likely to occur

17   following a phased unlock.  Id.  The number of inmates on a yard greatly outnumbers the

18   correctional staff members assigned to monitor the area.  Id.

19       In 2009-2010, McDonald considered numerous factors when deciding how and when to

20   safely resume outdoor exercise after the 2-5 modified program and he believed that every

21   modified program should end as quickly as is safely possible.  DSUF ¶ 72.  Striking the right

22   balance between security and safety and returning to normal programming as soon as possible is

23   difficult (DSUF ¶¶ 71) and the consequences of failing to impose a modified program or ending

24   one prematurely can be dire (DSUF ¶ 72).  The risk of lifting modified programming prematurely

25   is that further incidents of violence can occur.  DSUF ¶ 73.[21]  This was the recent experience on

26   _____

27   [21]  Plaintiff objects to DSUF ¶ 73 on the grounds that evidence has not been presented regarding a separate attempted murder and that there is no mention of 2-5 ties.  Response to DSUF ¶ 73.  Though defendants do not cite to it, the record contains evidence of the facts in DSUF ¶ 73

28   (continued)

1    B-Facility, as the September 17 attacks occurred approximately one week after B-Facility

2    returned to normal programming following another attempted murder, making McDonald

3    particularly cautious about lifting the 2-5 modified program prematurely.  Id.

4            It was not feasible to utilize the small concrete yards on B-Facility for exercise during the

5    2-5 modified program for several reasons.  DSUF ¶ 74.[22]  The concrete yards could safely

6    accommodate approximately ten to twenty prisoners at a time and devoting custodial staff to

7    evaluating, selecting, escorting, and supervising such small groups would significantly impede

8    and delay investigations and lengthen the time that all inmates would be deprived of exercise on

9    the main yard and other programming activities.  DSUF ¶ 74(b).[23]  Placing up to twenty Level IV

10   inmates in an enclosed space the size of a basketball court could have been disastrous because if

11   an inmate were assaulted in one of the enclosed concrete yards, he would have been trapped with

12

13   _____

14   beyond defendant McDonald's declaration.  Exhibit D to the statement of facts shows modified
     program HOP-B-09-21, for the attempted murder of an inmate, beginning on July 31, 2009, and
15   ending on September 9, 2009.  ECF No. 77-1 at 4.  Exhibit E includes an incident report from
     July 30, 2009, for the attempted murder of an inmate.  Id. at 10.  Additionally, plaintiff has
16   admitted that prior to the 2-5 modified program, there were a number of violent incidents on B-
     Facility, including multiple attempted murders (Response to DSUF ¶ 85) and the sealed,
17   confidential memorandum from October 2, 2009, indicates that there had been previous incidents
     involving suspected 2-5 members, though it does not specify which incidents (ECF No. 92 at 3).
18   There is sufficient evidence to support DSUF ¶ 73 and plaintiff's objection is overruled.
     [22] Plaintiff objects to DSUF ¶ 74 and provides arguments why each subsection of DSUF ¶ 74 is
19   incorrect.  Response to DSUF ¶ 74.  Plaintiff's objections to each subsection will be addressed
     separately, with the exception of subsection (a) because the court finds it to be irrelevant to the
20   motion.  The historic and intended use of the concrete yards by administrative segregation
     overflow and security housing unit inmates, without more, is irrelevant to whether the yards could
21   have been used for inmates subject to the modified program.
     [23] Plaintiff argues that federal law requires segregated inmates a minimum of ten hours per week
22   of yard exercise (Response to DSUF ¶ 74(b)), however, this argument relates to whether or not
23   his constitutional rights were violated and does nothing to dispute the facts presented.  He also
     argues that "[e]scorting plaintiff to this yard 2-3 times a week would not have impeded on the
24   investigation at all times and it would not deprive non-segregated inmates any main yard
     programming activities."  Id.  Again, this is argument and relates to the analysis of whether
25   plaintiff's rights were violated and whether the conditions imposed were reasonable.  It does not
     actually dispute the facts presented.  Moreover, plaintiff fails to support his opinion with any
26   competent evidence.  DSUF ¶ 74(b) will be deemed undisputed and plaintiff's arguments will be
     considered below in Section VIII.B.
27

28

no means of escape.  DSUF ¶ 74(c).[24]  Putting ten to twenty inmates in such a situation exposed

them to an unreasonable risk of harm.  Id.  The 2-5 gang was engaged in a concerted and

coordinated effort to murder all sex offenders on B-Facility and providing 2-5 members an

opportunity to meet and make further plans would have undermined one of the mains reasons for

placing them on modified program in the first place, which was to prevent them from planning

and carrying out further violence.  DSUF ¶ 74(d).[25]

5.    Restrictions on Religious Practice (DSUF ¶¶ 75-77)

Allowing inmates to participate in group worship while on modified program presented

staffing and security issues similar to those faced by permitting outdoor exercise because the

areas reserved for group worship were small and enclosed.  DSUF ¶ 75.  Specifically, allowing

group worship posed the same issues in regard to diverting staffing resources, the potential for

violence in an enclosed space, and the opportunity to communicate and conspire with other

inmates.  Id.  Alternative means of religious practice remained available to inmates during a

modified program.  DSUF ¶ 76.[26]  Upon an inmate's request, custody staff would arrange a cell

---

[24]  Plaintiff argues that it would have not been necessary to escort all twenty inmates at once because that is not done on the administrative segregation yards and inmates are classified before they can have yard privileges.  Response to DSUF ¶ 74(c).  These arguments go toward the analysis of whether plaintiff's rights were violated and the reasonableness of the conditions imposed, and do not actually dispute the facts in DSUF ¶ 74(c), which is deemed admitted.  Plaintiff's arguments will be considered below in Section VIII.B.

[25]  Plaintiff argues that 2-5 members would not have been able to carry out further attacks because they were segregated and inmates on the concrete yards had no desire to plan further attacks.  Response to DSUF ¶ 74(d).  Plaintiff's argument does not actually dispute the facts in DSUF ¶ 74(d), but instead argues that the reasoning makes no sense.  Plaintiff's argument regarding the intent of other inmates is also unsupported by any evidence.  The facts in DSUF ¶ 74(d) will therefore be deemed undisputed and plaintiff's arguments will be considered below in Section VIII.B.

[26]  Plaintiff objects to DSUF ¶ 76 by summarily stating that it is not true and arguing that defendants have not presented evidence that a religious leader ever visited plaintiff or any other inmate upon request.  This objection is insufficient to create an issue of fact.  See e.g., Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (conclusory allegations, unsupported by evidence are insufficient to defeat a motion for summary judgment); see also Villarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (no "genuine issue" of fact if only evidence presented is the "uncorroborated and self-serving" testimony of the opposing party).  The contents of DSUF ¶ 76 are supported by defendant McDonald's declaration and as warden he is competent to testify to the policies and practices in place at that time and DSUF ¶ 76 is deemed admitted to the extent (continued)

27

visit with religious and spiritual leaders.  Id.  Additionally, once an inmate's cell and property were searched, the inmate would be provided access to his religious property, allowing for in-cell religious study.  DSUF ¶ 77.[27]

F.      2-5 Modified Program

1.      Time and Scope (DSUF ¶¶ 78-84)

While portions of the modified program at issue applied only to specific groups of inmates, the restrictions were not arbitrary.  DSUF ¶ 78.  Based on the information defendant McDonald was provided, he believed that: (1) there were unknown numbers of unidentified inmates involved; (2) the investigators had properly identified the target groups of inmates (i.e. 2-5 members or associates housed on B-Facility); (3) the only way to ensure the safety of staff and inmates and the security of the institution was to remove or isolate this target group; and (4) the consequences for failing to act would have been dire.  Id.  All restrictions imposed on inmate access to the main exercise yards during modified programming were imposed with the belief that the restrictions would be effective in preventing further acts of violence and would help to restore order.  DSUF ¶ 79.  McDonald repeatedly instructed staff that his objective was to return to normal programming as soon as it was safe to do so and he believed that his staff worked diligently to achieve that objective.  DSUF ¶ 80.

McDonald's intent was always to return the affected inmates to regular programming as soon as was safely possible, but knowing when and how to return to regular programming after an incident is a difficult and delicate decision and the restrictions placed on outdoor exercise during the modified program at issue were based on considerations of the safety and security of the institution, staff, inmates, and the public.  DSUF ¶ 81.  As each investigation progressed, McDonald developed a plan to release all affected inmates from the restriction of the modified program as soon as he determined it was safe to do so, and when he believed that it was safe to

it outlines what custody staff were supposed to do.  Plaintiff's allegations from his motion for summary judgment that his requests were ignored will be addressed below in Section VIII.A.
[27]  Plaintiff's response to DSUF ¶ 77 is pure argument related to the adequacy of this alternative and will be considered below in Section VIII.A.  Response to DSUF ¶ 77.  Since there is no actual dispute, DSUF ¶ 77 is deemed admitted.

restart normal programming activities, based on all the information provided by prison staff, he implemented a gradual, calculated release based on those restrictions.  DSUF ¶ 82.  Based upon the reports received, McDonald and his staff believed that the modified program at issue was (1) necessary to protect the lives of correctional staff and inmates because of significant and credible threats of continued violence; (2) a response to severe and unusually high levels of violence on B-Facility; (3) designed solely to protect the lives and safety of inmates and correctional staff members, who they believed were in imminent danger of violent assaults; (4) did not last any longer than was necessary to protect the lives and safety of inmates and correctional staff; (5) was not intended to prejudice or harass anyone; and (6) did not violate any statutory or constitutional rights.  DSUF ¶ 83.[28]  Defendants' belief is supported by the marked decrease in violence on B-Facility as the 2-5 modified program progressed and inmates identified as 2-5 members were removed from the sensitive needs population.  DSUF ¶ 84.

## 2.      Events Preceding 2-5 Modified Program (DSUF ¶¶ 85-98)

Prior to the 2-5 modified program, there were a number of violent incidents on B-Facility, including multiple attempted murders, and much of the violence involved the use of inmate manufactured weapons.  DSUF ¶ 85, 87-94.  A majority of the violence was directly attributable to the 2-5 disruptive group.  DSUF ¶ 86.  As a result of the incidents, B-Facility experienced several modified programs between February 18, 2009, and September 9, 2009.  DSUF ¶¶ 87-94.  The modified program that ended on September 9, 2009, was the result of an attempted murder.  DSUF ¶¶ 93-94.  On September 17, 2009, approximately a week after B-Facility returned to normal programming, there was a third attempted murder, which led to the implementation of the 2-5 modified program.  DSUF ¶ 95.

## 3.      September 17, 2009 Incident (DSUF ¶¶ 99-104)

One of the most serious incidents that occurred on B-Facility took place on September 17, 2009, when three members of the 2-5 disruptive group assaulted inmates on the sensitive needs

---

[28]  Plaintiff disputes only subsection (6) of DSUF ¶ 83.  Response to DSUF ¶ 83.  Plaintiff's dispute does not cause an issue of fact because he disputes whether defendants' actions violated his rights, not whether they believed their actions violated his rights.

1    yard.  DSUF ¶ 99.  The incident consisted of two violent, coordinated stabbings on the main

2    exercise yard that were planned to occur at exactly the same time on opposite ends of the yard.

3    DSUF ¶ 100.  Three inmates who were associated with the 2-5 disruptive group stabbed three

4    other inmates with inmate manufactured weapons causing serious injuries to all the victims.

5    DSUF ¶ 101.  All three victims were transported to outside hospitals, one by ambulance and two

6    by air.  DSUF ¶ 102.  Subsequent investigation uncovered multiple sources that stated the attacks

7    were part of a coordinated effort by the 2-5 gang to systematically murder or remove sex

8    offenders from B-Facility.  DSUF ¶ 103.  Information discovered during the investigation

9    indicated that the 2-5 would continue to attack sex offenders every time B-Facility returned to

10   normal programming until they were transferred to another institution.  DSUF ¶ 104.

11                4.    Initiation of Modified Program and Investigation (DSUF ¶¶ 105-15)

12           As a result of the September 17, 2009 incident, all inmates on B-Facility were placed on

13   modified programming on September 18, 2009, thus beginning the 2-5 modified program.  DSUF

14   ¶ 105.  During the 2-5 modified program all inmates' central files were reviewed to determine

15   gang or disruptive group affiliation.  DSUF ¶ 106.[29]  During the investigation, which included

16   interviews with each inmate, custody staff specifically attempted to identify which inmates were

17   affiliated with the 2-5 disruptive group.  DSUF ¶¶ 107-08.

18           Given the severity of the September 17 attack, custody staff believed it was imperative

19   that inmates identified as being affiliated with the 2-5 were isolated from the remainder of the

20   inmate population on B-Facility and on October 6, 2009, all such inmates were removed from

21   their cells and escorted to the B-Facility dining hall.  DSUF ¶¶ 109-10.  Once in the dining hall,

22   gang investigators photographed the inmates to document any gang-related tattoos and conducted

23   interviews to determine any gang affiliation while correctional officers searched the inmates'

24   cells and removed all property.  DSUF ¶¶ 111-12.  The inmates' property was searched for

25   ────────────────────

26   [29]  Plaintiff's objection to DSUF ¶ 106 because his file did not contain any gang or disruptive
     group affiliation is overruled.  There is a 2007 memo indicating plaintiff was a 2-5 member or

27   associate (ECF No. 92 at 14-16, under seal) and whether it was located in his central file or
     elsewhere is immaterial.

28

anything that would indicate gang affiliation.  DSUF ¶ 113.  Inmates identified as being affiliated

with the 2-5 were separated from other B-Facility inmates and housed in Building Two, Section

C, where they remained on modified program status while inmates not affiliated with the 2-5

were removed and re-housed in another unit.  DSUF ¶¶ 114-15.

                  5.      Plaintiff's Identification as a 2-5 Member (DSUF ¶¶ 116-18)

In a confidential memo dated December 11, 2007, plaintiff was identified as a member of

the 2-5 disruptive group by an inmate who claimed that he was assaulted by 2-5 members and

then used as a witness against them.  DSUF ¶ 116.  The information provided by this inmate was

deemed reliable because it was corroborated by other confidential sources, through investigation,

or by information provided by a non-confidential source.  DSUF ¶ 117.  Based on this

information, plaintiff was housed in B-Facility, Building Two, Section C with the other suspected

members of the 2-5 gang.  DSUF ¶ 118.

                  6.      October 2009: Attempt to Return Non-2-5 Inmate to Normal Programming (DSUF ¶¶ 119-29)

On October 20, 2009, defendant Van Leer drafted a memorandum to defendant McDonald

in which he indicated that B-Facility supervisors believed that all inmates identified as 2-5

members had been removed from the remainder of the inmate population and placed in Building

2, C Section.  DSUF ¶ 119.  Based on this belief, the B-Facility supervisors thought that the root

of the recent violence had been removed and the remainder of the B-Facility population could

return to normal programming.  DSUF ¶ 120.

However, on October 23, 2009, first watch staff intercepted a letter that stated, "I hear

some more shit is going to go down on Monday.  So we will probably be on lockdown again."

DSUF ¶ 121.  The inmate who authored the letter was interviewed the following day and said that

the 2-5 were going to continue "removing 'Sex Criminals' from the yard" and that the inmate was

to be assaulted with a weapon made of metal.  DSUF ¶¶ 122, 124.  The inmate also told prison

officials that white inmates not affiliated with the 2-5 were planning a larger-scale attack on 2-5

members because the 2-5 attacks were affecting their programming.  DSUF ¶ 125.

/////

On October 24, 2009, an inmate was interviewed concerning a statement he had made to his mother on the telephone during second watch where he stated that the 2-5 were going to stab a child molester in Building One.  DSUF ¶ 126.  The inmate's cellmate was also interviewed and stated that he had also heard that the 2-5 were going to stab a child molester.  DSUF ¶ 127.  The same day, an officer overheard another inmate tell his mother that the facility would be back on lockdown on Monday and that he would not be able to call.  DSUF ¶ 128.

Based on this information, defendant McDonald placed B-Facility on lockdown on Monday, October 26, 2009.  DSUF ¶ 129.

### 7.   November 2009: Resumption of Modified Program (DSUF ¶¶ 130-40)

Beginning on November 2, 2009, prison officials once again began to review inmate central files and conduct interviews with inmates in an effort to identify additional inmates affiliated with the 2-5.  DSUF ¶ 130.  Inmates with identifying tattoos or other substantiated evidence of 2-5 affiliation were re-housed in Building Two, Section C of B-Facility.  DSUF ¶ 131.  If no evidence of 2-5 affiliation was found, the inmate was required to sign an unlock chrono that indicated he would not participate in gang activities and would program non-violently.  DSUF ¶ 132.  The goal was to move all inmates with suspected 2-5 affiliation into Building Two, Section C, while inmates with no affiliation would be housed in Buildings One, Three, Four, and Five and the B-Facility gym.  DSUF ¶ 133.  The purpose was to ensure that Buildings One, Three, Four, and Five and the gym were housed with inmates that wanted a positive, non-violent program.  DSUF ¶ 134.

The renewed investigation began with inmates housed in the gym where most of B-Facility's critical workers were housed, so that these inmates could return to work at the earliest possible time in order to alleviate some of the strain on correctional staff.  DSUF ¶ 135.  Once all central files were reviewed and all inmates were interviewed, McDonald's plan was that those housed in the gym would begin Phase One of a phased return to normal programming with the investigation continuing building by building until each housing unit was cleared of suspected 2-5 affiliates.  DSUF ¶¶ 136-37.  Once this was accomplished, each housing unit would receive

/////

evening dayroom on a rotational basis, canteen, quarterly packages, and contact visits.  DSUF ¶ 138.

On November 12, 2009, a member of the 2-5 informed correctional staff that he had been directed to use an inmate manufactured key to escape his handcuffs during his escort to the showers and to assault staff once he was free.  DSUF ¶¶ 139-40.  Based on this information, B-Facility was placed on modified program.  DSUF ¶ 140.

8.   December 2009: Phased Return to Normal Programming (DSUF ¶¶ 141-53)

On December 1, 2009, B-Facility initiated Phase One of a modified program.  DSUF ¶ 141.  During Phase One, all inmates were fed in their cells and those not suspected of participation in gang activities were provided yard access on a rotating basis, with one tier from a building being released at a time.  DSUF ¶¶ 142-43.  During this period there were no incidents involving the inmates released for yard.  DSUF ¶ 144.

On December 14, 2009, B-Facility initiated Phase Two of the modified program.  DSUF ¶ 145.  During Phase Two, both tiers from a building were released for yard at the same time with one building released for morning yard and a different building for afternoon, so that Buildings One through Five and the gym would receive yard time every third day.  DSUF ¶ 146.  Inmates not suspected of participation in gang activities had access to the telephone and canteen, were escorted unrestrained to medical appointments, and received their morning meal in the dining hall with evening meals received in cell.  DSUF ¶ 147.  All inmates were escorted in handcuffs for non-contact visits, could arrange for law library access, and were limited to in-cell religious study.  DSUF ¶ 148.  During Phase Two, no incidents occurred that would preclude the implementation of Phase Three.  DSUF ¶ 149.

On December 28, 2009, B-Facility initiated Phase Three of the modified program.  DSUF ¶ 150.  All privileges that were restored during Phases One and Two continued and inmates not suspected of participation in gang activities received all meals in the dining hall while those suspected of gang activity continued to receive meals in their cells.  DSUF ¶¶ 151-52.

/////

1          9.      January 2010: Interruption of Phased Unlock (DSUF ¶¶ 154-66)

2          On January 4, 2010, written information was intercepted indicating that an inmate

3    affiliated with the 2-5 disruptive group was conspiring with other inmates to assault unidentified

4    correctional staff and inmates on B-Facility.  DSUF ¶ 154.  Secondary information was also

5    received from other confidential sources indicating that inmates affiliated with the 2-5 were

6    attempting to recruit other inmates not currently on modified program to carry out assaults on B-

7    Facility staff.  DSUF ¶ 155.

8          On January 5, 2010, an inmate was interviewed regarding a note he authored in which he

9    indicated that his cellmate intended to assault three correctional officers and that his cellmate had

10   been discussing with another inmate whether to assault staff or sex offenders.  DSUF ¶¶ 156-57.

11   The second inmate was interviewed and stated that he had no intention of assaulting staff, only

12   sex offenders.  DSUF ¶ 158.  He indicated that members and associates of the 2-5 were still

13   planning on carrying out assaults on sex offenders, that there were an ample amount of metal

14   weapon stock and weapons on the yard, that the targets were selected, and that the 2-5 members

15   that were to carry out the stabbing assaults had also been selected.  DSUF ¶¶ 159-60.

16         Based on this information, all of B-Facility was placed on lockdown[30] on January 7, 2010,

17   so that further investigation could occur.  DSUF ¶ 161.  The investigation included extensive

18   searching and interviewing of inmates and their housing areas and resulted in the identification of

19   several additional members of the 2-5 disruptive group who were re-housed in Building 2, Unit C

20   with the other 2-5 inmates.  DSUF ¶¶ 162-64.  The searches and interviews did not lead to the

21   discovery of any weapons or any information that would corroborate the information regarding

22   the conspiracy to assault staff and sex offenders on B-Facility and correctional staff therefore

23   recommended that B-Facility resume the modified program at Phase Two.  DSUF ¶¶ 165-66.

24         10.     February 2010: Continued Attempts to Unlock (DSUF ¶¶ 167-74)

25         McDonald implemented the recommendation to resume Phase Two on February 9, 2010.

26   ──────────────────

[30]  Although DSUF ¶ 161 states the facility went on modified program, the documentation cited
27   (ECF No. 92 at 6-7, under seal) and other documentation provided (ECF No. 77-2 at 53) indicate
     the facility went on lockdown.

28

DSUF ¶ 166.  On February 22, 2010, B-Facility returned to Phase Three of the modified program as there had been no incidents that would preclude its implementation.  DSUF ¶ 167.  All inmates that had not been identified as participating in gang activity received their meals in the dining hall, had access to canteen and the telephone, and received yard on a rotating basis.  DSUF ¶¶ 168-69.

On February 28, 2010, prison officials received additional information about potential future assaults from an inmate that had recently been transferred to HDSP.  DSUF ¶ 170.  This inmate indicated that he had connections with the Mexican Mafia, could communicate with inmates housed in any facility within the institution, and had knowledge of staff assaults that were to take place on B-Facility, D-Facility, and Unit Z.  DSUF ¶¶ 171-72.  B-Facility was placed on modified program, but an investigation determined the threat was not credible and B-Facility was returned to Phase Three of the modified program within two days.  DSUF ¶ 173-74.

11.     March 2010: Continuation of Phased Unlock (DSUF ¶¶ 175-181)

On March 2, 2010, B-Facility returned to amended Phase Three of the modified program and moved into Phase Four on March 9, 2010.  DSUF ¶¶ 175-76.  As of March 9, 2010, the inmate population on B-Facility, excluding those associated with the 2-5, had successfully completed Phase Three of the modified program without any further incidents of violence and staff had identified and removed all inmates suspected of being associated with the 2-5 disruptive group from the general inmate population on B-Facility.  DSUF ¶¶ 177-78.  During Phase Four, inmates on modified program had yard time every third day and dayroom access two times during a three day period.  DSUF ¶ 179.  Investigations continued into the actions, activities, and membership of inmates in the 2-5 disruptive group with the goal of gathering information that would allow for the validation of inmates identified as members of the 2-5 disruptive group.  DSUF ¶¶ 180-81.

12.     May 2010: Return to Normal Programming (DSUF ¶¶ 182-90)

Since the inmates identified as 2-5 members had been placed on modified program, inmate violence on B-Facility was significantly reduced.  DSUF ¶ 183.  On May 17, 2010, the investigation regarding threats to inmates and staff on B-Facility by the 2-5 gang was concluded.

35

DSUF ¶ 182.  Staff identified sixteen inmates perpetuating the unrest and disruption, twenty-nine

inmates with ties or association with these inmates, and a preliminary list of eleven inmates with

no association.  DSUF ¶ 184.  The inmates in question continued to be monitored to determine

any gang, violent, or disruptive activity, and on May 18, 2010, all sixteen inmates identified as

perpetuating the unrest were placed in administrative segregation.  DSUF ¶ 185-86.

On May 19, 2010, B-Facility staff began to return inmates identified as having little or no

apparent association with the 2-5 to normal programming.  DSUF ¶ 187.  On May 24 and May

25, 2010, correctional counseling staff interviewed nineteen inmates who were identified as

having some ties to the 2-5.  DSUF ¶ 188.  Each of these inmates stated their willingness to

positively program and to not participate in any gang, violent, or illegal activities and signed the

CDCR-128-B Unlock Chrono, documenting this willingness.  DSUF ¶ 189.  Plaintiff signed an

unlock Chrono on May 24, 2010, and was returned to normal programming the following day.

DSUF ¶ 190.

G.      Plaintiff's Medical Care (DSUF ¶¶ 191-213)

Defendant J. Clark saw plaintiff once during the relevant time period on April 28, 2010,

regarding his medical concerns.  DSUF ¶ 191.  Prior to that, Clark reviewed three health care

requests in which plaintiff complained of stomach cramps and diarrhea, the first of which was

dated February 22, 2010.  DSUF ¶¶ 192-93.  In his first health care request, Mitchell stated "I

need medication for stomach flu/diar[rh]ea symptoms.  Maybe something I ate."  DSUF ¶ 194;

ECF No. 77-2 at 37.  The request was initially reviewed by another registered nurse on February

23, 2010.  DSUF ¶ 195.[31]  The request form shows that it was reviewed by Clark on March 18,

2010.  ECF No. 77-2 at 37.[32]  At that time, plaintiff had an appointment with his primary care

physician on March 26, 2010, and had not submitted any additional health care requests related to

his stomach.  DSUF ¶¶ 197, 199.  Due to the nature of the complaint, which indicated the issues

[31]  Plaintiff objects to DSUF ¶ 195 on the grounds that he was not seen in a reasonable time, but
does not dispute that another nurse conducted the first review.  Response to DSUF ¶ 195.  DSUF
¶ 195 is therefore deemed undisputed.

[32]  Plaintiff's dispute with when Clark actually reviewed the request will be addressed below in
Section VIII.C.

1  may have been caused by something plaintiff ate, defendant Clark believed that his health

2  concerns were likely resolved at the time he reviewed the request.  DSUF ¶ 199.  Clark therefore

3  believed it was unnecessary to schedule an appointment any earlier than March 26, 2010.  DSUF

4  ¶ 200.[33]

5  On March 26, 2010, Clark reviewed a second health care request dated March 23, 2010, in

6  which plaintiff stated "I have been experiencing reoccurring bouts of stomach pains, irregularity,

7  dia[rrhea.  Need my I.B.S. medication (d[i]cyclomine) to be re-issued and possibly see a

8  gastrologist [sic].  Pains have been on and off over the last month."  DSUF ¶ 201; ECF No. 77-2

9  at 38.  Since plaintiff was scheduled to see his primary care physician that same day and Clark

10  believed plaintiff's doctor was better suited to address his health concerns, Clark did not believe it

11  was necessary to schedule plaintiff for an appointment with him as well.  DSUF ¶ 203.[34]

12  As a registered nurse, defendant Clark could not prescribe or renew medications and it

13  was appropriate for Clark to keep plaintiff's appointment with his primary care physician, who

14  could prescribe medication.  DSUF ¶ 204.  Nothing in plaintiff's medical records indicate that

15  Clark took any action to prevent the March 26, 2010 appointment from occurring.  DSUF ¶ 205.

16  On April 22, 2010, Clark reviewed a third health care request, dated April 20, 2010, where

17  plaintiff stated the following:

18  > On 2-2-10, I requested services for stomach flu/dia[rrh]ea/possible
food poisoning but not called to see a Dr.  On 3-23-20, I requested

19  > medical attention for reoccurring stomach pains, dia[rrh]ea
(possibly related to my I.B.S.) and I have still not seen a Dr.  I am

20  > continuing to experience crippling bouts of stomach pain (cramps),
dia[rrh]ea which limit my ability to function properly.  (I request to

21  > see a stomach specialist.)"

22

23  DSUF ¶ 206; ECF No. 77-2 at 39.

24  On April 28, 2010, Clark saw plaintiff regarding his complaints of cramping, occasional

25  [33]  Plaintiff's "dispute" does not create an issue of fact regarding Clark's belief, but instead

26  implies the belief was unreasonable or unfounded.  Response to DSUF ¶ 200.  DSUF ¶ 200 is
therefore deemed undisputed and plaintiff's argument will be addressed in Section VIII.C. below.

27  [34]  Plaintiff argues that he did not actually see a physician that day, but does not otherwise
dispute DSUF ¶ 203.

28

1    diarrhea, and nausea.  DSUF ¶ 208.  During the exam there was no indication that plaintiff was

2    seriously ill or crippled and Clark noted that plaintiff had a history of irritable bowel syndrome

3    treated in the past with dicyclomine.  DSUF ¶ 209.  The notes also indicate that plaintiff had

4    normal bowel sounds, normal bowel movement, normal vital signs, and that the exam was

5    otherwise unremarkable.  Id.  The records show that after recording plaintiff's medical concerns

6    and taking his vital signs, Clark conferred with plaintiff's primary care provider[35] who prescribed

7    fiber tablets.  DSUF ¶ 210.  Because Clark's license did not permit him to prescribe medications,

8    he was not responsible for the fiber tablet prescription or any side effects that may have occurred.

9    DSUF ¶ 211.  Plaintiff saw his primary care provider on May 14, 2010,[36] at which time he was

10   prescribed dicyclomine to treat his symptoms, which apparently quickly subsided.  DSUF ¶ 212;

11   ECF No. 77-2 at 27.

12   VII.   Legal Standard for Summary Judgment

13           Summary judgment is appropriate when the moving party "shows that there is no genuine

14   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

15   Civ. P. 56(a).

16           Under summary judgment practice, the moving party "initially bears the burden of

17   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

18   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

19   The moving party may accomplish this by "citing to particular parts of materials in the record,

20   including depositions, documents, electronically stored information, affidavits or declarations,

21   stipulations (including those made for purposes of the motion only), admission, interrogatory

22   answers, or other materials" or by showing that such materials "do not establish the absence or

23   ──────────────

24   [35]  The records show that defendant Clark conferred with "PCP Miranda" (ECF No. 77-2 at 26)
     who is a physician's assistant (id. at 12, ¶ 19).  Therefore it is likely that "PCP" actually stands

25   for primary care provider, rather than physician as stated in the statement of undisputed facts.
     However, this discrepancy is not material as there does not appear to be any dispute that Miranda

26   was plaintiff's primary care provider and capable of prescribing medication to plaintiff.
     Response to DSUF ¶ 212; ECF No. 77-2 at 27.

27   [36]  Although DSUF ¶ 212 states the appointment was on May 17, 2010, plaintiff's medical record
     shows the date of his exam was May 14, 2010.

28

1    presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

2    support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden

3    of proof at trial, "the moving party need only prove that there is an absence of evidence to support

4    the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see

5    also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate

6    time for discovery and upon motion, against a party who fails to make a showing sufficient to

7    establish the existence of an element essential to that party's case, and on which that party will

8    bear the burden of proof at trial. See Celotex, 477 U.S. at 322.  "[A] complete failure of proof

9    concerning an essential element of the nonmoving party's case necessarily renders all other facts

10   immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as

11   whatever is before the district court demonstrates that the standard for entry of summary

12   judgment, . . . , is satisfied." Id. at 323.

13       If the moving party meets its initial responsibility, the burden then shifts to the opposing

14   party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

15   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

16   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

17   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

18   admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

19   Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

20   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

21   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

22   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

23   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

24   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

25       In the endeavor to establish the existence of a factual dispute, the opposing party need not

26   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

27   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

28   trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

1   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

2   Matsushita, 475 U.S. at 587 (citations omitted).

3       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

4   court draws "all reasonable inferences supported by the evidence in favor of the non-moving

5   party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011). It is

6   the opposing party's obligation to produce a factual predicate from which the inference may be

7   drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

8   aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing

9   party "must do more than simply show that there is some metaphysical doubt as to the material

10  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

11  nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation

12  omitted).

13      On February 3, 2014, the defendant served plaintiff with notice of the requirements for

14  opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF. No. 65-3.

15  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (movant may provide notice) (en banc),

16  cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

17  VIII.   Analysis

18      A.    Count II: First Amendment (Free Exercise of Religion)

19      A religious claim must satisfy two criteria to merit protection under the free exercise

20  clause of the First Amendment: (1) the claimant's belief must be "sincerely held" and (2) "the

21  claim must be rooted in religious belief, not in purely secular philosophical concerns." Malik v.

22  Brown, 16 F.3d 330, 333 (9th Cir. 1994) (citations and internal quotation marks omitted). The

23  free exercise right, however, is necessarily limited by the fact of incarceration, and may be

24  curtailed in order to achieve legitimate correctional goals or to maintain prison security. O'Lone

25  v. Shabazz, 482 U.S. 342, 348-49 (1987). To state a free exercise claim, a prisoner must show

26  that a defendant burdened the practice of the prisoner's religion by preventing him from engaging

27  in a sincerely held religious belief and that the defendant did so without any justification

28  reasonably related to legitimate penological interests. Shakur v. Schriro, 514 F.3d 878, 884 (9th

40

1   Cir. 2008).  To substantially burden the practice of an individual's religion, the interference must

2   be more than an inconvenience.  Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), overruled

3   in part by Shakur, 514 F.3d at 884-85.

4          In order to determine whether a policy is reasonable, analysis under Turner v. Safley, 482

5   U.S. 78 (1987), must be conducted.  "As formulated by the court in Turner – and subsequently

6   applied by [the Ninth Circuit] in Ashelman [v. Wawrzaszek], 111 F.3d 674 [(9th Cir. 1997)], and

7   Ward v. Walsh, 1 F.3d 873 (9th Cir. 1993) – the test weighs four factors in determining the

8   reasonableness of a prison regulation affecting constitutional rights."  Resnick v. Adams, 348

9   F.3d 763, 768-69 (9th Cir. 2003).  "First, there must be a 'valid, rational connection' between the

10  prison regulation and the legitimate governmental interest put forward to justify it'" and "the

11  governmental objective must be a legitimate and neutral one."  Turner, 482 U.S. at 89-90.  "A

12  second factor relevant in determining the reasonableness of a prison restriction . . . is whether

13  there are alternative means of exercising the right that remain open to prison inmates."  Id. at 90.

14  "A third consideration is the impact accommodation of the asserted constitutional right will have

15  on guards and other inmates, and on the allocation of prison resources generally."  Id.  "Finally,

16  the absence of ready alternatives is evidence of the reasonableness of a prison regulation.  Id.

17         Plaintiff alleges that defendants McDonald, Davey, Sanders, and Van Leer violated his

18  First Amendment rights by preventing him from practicing his religion.  ECF No. 1 at 20, ¶ 150.

19  Specifically, he alleged that during the 2-5 program he "was not allowed to participate in

20  religious activities, services, or speak with a religious advisor."  Id. at 15-16, 18, ¶¶ 119, 126,

21  141.

22         Defendants do not challenge whether plaintiff's beliefs are sincerely held or rooted in

23  religion or whether the restrictions constituted a substantial burden, so the issue before the court

24  is whether the restrictions on plaintiff's religious practice during the 2-5 modified program were

25  reasonably related to a valid penological purpose.

26              1.    Rational Relationship Between Policy and Penological Interests

27         Prison officials have a legitimate interest in maintaining the safety and security of the

28  prisons and in protecting the lives and safety of the inmates and officers within the prison.  Cutter

41

1   v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) ("prison security is a compelling state interest");

2   Farmer, 511 U.S. at 833 ("prison officials have a duty . . . to protect prisoners from violence at the

3   hands of other prisoners" (internal quotation marks and citation omitted)).  The undisputed

4   evidence shows that the governmental objective used to justify the modified program was

5   legitimate and neutral and was rationally related to the implementation of the modified program.

6   DSUF ¶¶ 83, 100-05.

7        The modified program was implemented in response to a violent, coordinated set of

8   assaults that were part of an organized effort by the 2-5 to murder and remove sex offenders from

9   B-Facility.  DSUF ¶¶ 100-05.  All inmates in B-Facility were affected by the modified program,

10  and plaintiff's inclusion in the more restrictive portion of the modified program was based on

11  prison officials' belief, based on existing documentation, that plaintiff was associated with the 2-5

12  disruptive group.  DSUF ¶¶ 105, 115-18.  It is undisputed that allowing group worship during the

13  modified program presented staffing and security issues because it would require diverting staff

14  to escort and supervise small groups of inmates, which would delay the investigation, and would

15  put groups of inmates together in a small enclosed space, which posed the risk for both potential

16  violence and an ability to make plans for additional violent incidents.  DSUF ¶ 75.  Furthermore,

17  the restriction on group religious services did not single out any one religious group and all out-

18  of-cell activities were restricted, especially for those inmates believed to be associated with the 2-

19  5.[37]  ECF No. 77-2 at 42-65.  Finally, it is undisputed that defendant McDonald and his staff

20  believed the modified program lasted only as long as necessary, was not intended to prejudice or

21  harass anyone, and was necessary to protect the lives of inmates and staff as a result of the severe

22  and unusually high levels of violence on B-Facility.  Response to DSUF ¶ 83.

23        The first prong of the Turner test weighs in defendants' favor.

24             2.    Alternatives Means of Religious Exercise

25        The second prong of the Turner analysis requires that the court determine "whether there

26

27  [37]  Group religious activities and a number of other out-of-cell activities were also restricted for
    the non-2-5 inmates at B-Facility.  ECF No. 77-5 at 42-65.

28

1   are alternative means of exercising the right that remain open to prison inmates." Resnick, 348

2   F.3d at 769. "The relevant inquiry under this factor is not whether the inmate has an alternative

3   means of engaging in a particular religious practice that he or she claims is being affected; rather

4   [the court is] to determine whether the inmates have been denied all means of religious

5   expression." Ward, 1 F.3d at 877 (citing O'Lone, 482 U.S. at 351-52).

6          It is undisputed that once an inmate's property was searched it was returned and the

7   inmates could conduct in-cell religious study (DSUF ¶ 77) and that plaintiff had access to a Bible

8   (ECF No. 64-2 at 105). Plaintiff argues that in-cell religious study is not comparable to "[b]eing

9   taught and worshipping with his religious leader" (Response to DSUF ¶ 77), but the alternative

10  means of religious expression are not required to be comparable, merely available. Additionally,

11  defendants have stated that religious advisors and spiritual leaders were available to inmates on

12  modified program or lockdown. DSUF ¶ 76. Plaintiff argues in conclusory fashion that this was

13  not true and that defendants failed to provide evidence that indicated a religious leader ever

14  visited plaintiff or other inmates on request. Response to DSUF ¶ 76. Defendants are not

15  required to prove that plaintiff, or any other inmates for that matter, took advantage of the

16  opportunity to have a religious leader visit their cell. They must show only that such an

17  opportunity existed, which they did through the declaration of defendant McDonald. While

18  documentation of inmates being visited by religious leaders would certainly also be evidence that

19  this opportunity existed, no particular type of evidence is required. Plaintiff's conclusory claim,

20  devoid of any supporting evidence, is insufficient to create a dispute of fact. See e.g., Taylor, 880

21  F.2d at 1045 (conclusory allegations, unsupported by evidence are insufficient to defeat a motion

22  for summary judgment); see also Villarimo, 281 F.3d at 1061 (no "genuine issue" of fact if only

23  evidence presented is the "uncorroborated and self-serving" testimony of the opposing party).

24         However, plaintiff also argues in his opposition to the motion that defendants "outright

25  refus[ed] to allow [him] the opportunity to worship with a religious leader." ECF No. 84 at 17.

26  This statement is unsupported by either a sworn statement or other documentary evidence and the

27  response to the motion for summary judgment is not signed under penalty of perjury. Moreover,

28  the excerpt from plaintiff's deposition that he attached to his statement of facts in support of his

43

1    own motion for summary judgment shows that he stated that his requests to be visited were

2    "never responded to."  ECF No. 64-2 at 105.  He also stated that he did not know if any spiritual

3    advisors were available at the time.  Id.  This does not support a claim of "outright denial."  Even

4    if plaintiff did request to see a spiritual advisor and his requests were ignored, he has neither

5    alleged nor provided evidence that he made his requests to any of the defendants, that any of the

6    defendants were aware of the requests, that defendants are the individuals that ignored him, or

7    that any of the defendants knew he was being ignored.  Plaintiff also fails to provide any evidence

8    that would support a claim that the policy during the modified program was to disallow cell-front

9    visits by spiritual advisors.

10          The second prong of the Turner analysis weighs in defendants' favor.

11                 3.     Impact of Accommodation

12          The third factor requires consideration of "the impact accommodation of the asserted

13   constitutional right will have on guards and other inmates, and on the allocation of prison

14   resources generally."  Turner, 482 U.S. at 90.  Defendants have provided evidence that allowing

15   group worship during the modified program would have presented the same staffing and security

16   problems as allowing outdoor exercise.  DSUF ¶ 75.  Specifically, group worship would have

17   required diverting staff to escort and supervise small groups of inmates, which would have

18   delayed the investigation, and would have put groups of inmates together in a small enclosed

19   space, which posed the risk for both potential violence and an ability to make plans for additional

20   violent incidents.  DSUF ¶¶ 74, 75.  Delaying the investigation would have meant extending the

21   modified program and extending the time before the facility could return to normal programming.

22   DSUF ¶ 74.  This would have impacted inmates, the staff at B-Facility, and the institution as a

23   whole because modified programs make it more difficult, labor intensive, and expensive to run

24   the prison.  DSUF ¶ 56.  It would also have defeated one of the main purposes of the modified

25   program, which was to prevent additional violence by keeping the inmates thought to be

26   associated with the responsible group from gathering where they could plan or engage in further

27   violence.  DSUF ¶ 74.  Allowing plaintiff and other suspected 2-5 associates to congregate would

28   have given them an opportunity to communicate with each other and either engage in violence or

44

1  devise plans for additional violence.  Id.  To the extent any of plaintiff's arguments regarding

2  these concerns as they relate to outdoor exercise apply to group religious worship, the arguments

3  are unsupported by competent evidence.  Response to DSUF ¶ 74.  Plaintiff has not established

4  that he has sufficient knowledge regarding the operational resources of the prison or the strain a

5  modified program puts on those resources.

6          The third factor also weighs in defendants' favor.

7                     4.     Ready Alternative to Regulation

8          The final factor requires the court to consider whether there is an absence of ready

9  alternatives to the policy.  The burden is on the prisoner challenging the regulation, not on the

10  prison officials, to show that there are obvious, easy alternatives to the regulation.  See O'Lone,

11  482 U.S. at 350; Casey v. Lewis, 4 F.3d 1516, 1523 (9th Cir. 1993) ("It is incumbent upon the

12  prisoners to point to an alternative that accommodates their rights at de minimis cost to security

13  interests.").  Plaintiff offers no alternative to the modified program other than to allow him to

14  participate in religious activities in the same manner he would if the modified program was not

15  running.  Were plaintiff the only inmate at issue, this would no doubt be reasonable.  However,

16  plaintiff was neither the only inmate on B-Faciliy nor the only inmate thought to be associated

17  with the 2-5.  All of B-Facility was subject to the modified program, and in 2009 that meant

18  approximately 1,100 inmates.  DSUF ¶¶ 35, 105.  Even if the court does not consider the rest of

19  B-Facility, there were approximately fifty inmates suspected of having ties to the 2-5.  ECF No. 1

20  at 13, ¶ 95; ECF No. 92 at 12, under seal; ECF No. 64-2 at 38.  In light of the number of other

21  inmates affected, plaintiff's suggestion does not present a ready alternative.

22                     5.     Conclusion

23          For these reasons, the court finds that the implementation of the 2-5 modified program,

24  which restricted group religious activities, was reasonably related to legitimate penological

25  interests.  Plaintiff does not establish a triable issue of fact as to whether defendants McDonald,

26  Davey, Sanders, or Van Leer improperly infringed on his religious exercise and defendants are

27  therefore entitled to summary judgment.

28

1       B.      Count III: Eighth Amendment (Outdoor Exercise)

2              A prison official violates the Eighth Amendment when the alleged deprivation is

3       objectively, sufficiently serious, resulting in the "denial of the minimal civilized measure of life's

4       necessities" and the defendant acted with a sufficiently culpable state of mind, one of deliberate

5       indifference to inmate health or safety.  The official must know of and disregard "an excessive

6       risk to inmate health or safety" and then fail to take reasonable measures to abate the substantial

7       risk of serious harm.  Id. at 837, 847.

8              Plaintiff alleges that defendants McDonald, Davey, Van Leer, and Sanders violated his

9       Eighth Amendment rights when he was denied outdoor exercise for a period of approximately

10      eight months as a result of the 2-5 modified program.  ECF No. 1 at 20, ¶ 151.  Appropriately,

11      defendants do not argue that plaintiff did not suffer an objectively serious deprivation.  See

12      Thomas, 611 F.3d at 1151 ("'lack of outside exercise for extended periods is a sufficiently serious

13      deprivation' for Eighth Amendment purposes" (quoting LeMarie v. Maass, 12 F.3d 1444, 1457

14      (9th Cir. 1993)); Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (deprivation of outdoor

15      exercise for a period of six and one-half weeks is sufficiently serious deprivation for Eighth

16      Amendment purposes).  Nor do they argue that defendants were unaware of a substantial risk of

17      serious harm to plaintiff.  See Farmer, 511 U.S. at 842 ("[A] factfinder may conclude that a prison

18      official knew of a substantial risk from the very fact that the risk was obvious."); Thomas, 611

19      F.3d at 1152 (concluding that extended denials of outdoor exercise pose an obvious risk to inmate

20      health).  Defendants do, however, argue that there was a reasonable justification for allowing

21      plaintiff to face the risk.

22             Based on the undisputed facts outlined above in Section VI, plaintiff does not appear to

23      argue that the 2-5 modified program was inherently unreasonable or excessive in duration, and in

24      fact appears to agree that it was necessary and ended as soon as was safely possible.  Even if

25      plaintiff is attempting to argue that the 2-5 modified program was unreasonably implemented or

26      excessive in duration, defendants have met their burden of showing the modified program was

27      reasonably justified by the violence being perpetuated by the 2-5 and, in light of the undisputed

28      facts, plaintiff is unable to raise a genuine issue of material fact on this issue.  However, plaintiff

46

argues instead (1) that he was inappropriately identified as a possible 2-5 member and this misidentification should have been corrected sooner, and (2) that the small concrete yards could have been used to provide outdoor exercise to himself and the other inmates identified as possible 2-5 members.  ECF No. 84 at 13; Response to DSUF ¶¶ 28, 74.106, 116, 131.  These arguments will be addressed in turn.

### 1. Misidentification

There is no allegation that plaintiff was involved in the attacks that took place on September 17, 2009.  However, it is undisputed that there was a memorandum from December 2007, in which an inmate identified plaintiff as a member of the 2-5 and that this memorandum is what led to plaintiff's inclusion in the group of suspected 2-5 members.  DSUF ¶¶ 116, 118.  Though plaintiff argues that because this memorandum was the only evidence that he was associated with the 2-5 and was insufficient without more to warrant his inclusion in the group of 2-5 suspects, he offers no evidence that it was unreasonable for prison officials to rely on the memorandum.  Moreover, even if it was unreasonable to rely on the memorandum, there is no evidence that defendants McDonald, Davey, Van Leer, or Sanders either (1) reviewed the documentation and made the determination to include plaintiff in the group of suspected 2-5 members or (2) had reason to question the decision of the individual(s) that made the determination.

Though plaintiff argues that Sanders could have alerted her supervisors to the fact that the memorandum was the only evidence of his 2-5 affiliation (Response to DSUF ¶ 28), he does not dispute that she had no authority to alter his designation and was not responsible for investigating or determining an inmate's gang association (Declaration of A. Sanders at 2, ¶¶ 11-13 [ECF No. 77-2 at 3]).  Moreover, since Sanders was not involved in investigating inmate gang associations, which was being handled in part by the gang investigation unit and included more than simply reviewing an inmate's file (DSUF ¶¶ 57, 111, 113), it is unclear why she would have any reason to believe that the memorandum was the only piece of evidence establishing plaintiff's gang association or that it had not already been discovered.

It is undisputed that prison officials had a genuine safety concern regarding the 2-5

47

1    disruptive group and plaintiff cannot show that his identification as a 2-5 suspect was either

2    unreasonable or the result of the actions of defendants McDonald, Davey, Van Leer, or Sanders.

3                       2.  Reasonable Alternatives

4        Plaintiff also argues that he should have been permitted to use the small concrete yards for

5    exercise during the 2-5 program.  Response to DSUF ¶ 74.  He argues that they were designated

6    for administrative segregation overflow and security housing unit inmates and would have

7    therefore offered a reasonable alternative.  Id.  However, defendants provide evidence that the

8    yards were approximately the size of a basketball court and could accommodate, at most, twenty

9    inmates.  DSUF ¶ 74.  Taking staff away from the ongoing investigation would have been

10   necessary in order to evaluate, select, escort, and supervise such small groups of inmates, leading

11   to the modified program continuing for a longer period of time.  Id.  Plaintiff argues, without any

12   evidence to support the claim, that because the law requires a minimum of ten hours of exercise

13   per week, escorting him to the yard two to three times a week would not have caused any

14   additional delays.  Response to DSUF ¶ 74.  While the burden of escorting plaintiff by himself

15   may have been minimal, there were approximately fifty other inmates that had been identified as

16   potential 2-5 members and were not allowed outdoor exercise, and the reasonableness of the

17   alternative must be considered in this context.  ECF No. 1 at 13, ¶ 95; DSUF ¶ 184.  Moreover,

18   while this may have been reasonably accomplished while the prison was running a normal

19   program, there are additional demands on prison resources, including available staff, during a

20   modified program.  DSUF ¶ 56.

21       In response to defendants' claim that allowing twenty inmates to use the yard at a time

22   presented an increased danger for any inmate because the close confines meant no means of

23   escape in the event of an assault, plaintiff argues that it would not be necessary to escort that

24   many inmates at one time and that inmates are classified first to avoid such incidents.  Response

25   to DSUF ¶ 74.  Plaintiff's first argument is unconvincing because even if escorting smaller groups

26   would have been effective, it would have placed an even greater strain on staff resources because

27   it would have required escorting even more groups of inmates.  Plaintiff's second argument

28   carries more weight.  Presumably, inmates using the concrete yards would be those already

1   identified as potential 2-5 members, in which case they would not have been the targets of the

2   assaultive behavior that was the concern of the modified program, though they would have still

3   been Level IV inmates.  However, even if there was not a danger of further violence among the 2-

4   5 suspects, allowing them to meet in a group would have undermined one of the main purposes of

5   the modified program, which was to prevent the 2-5 from planning and carrying out further

6   violence.  DSUF ¶ 74.  While plaintiff argues this makes no sense because they were already

7   segregated from other inmates, it ignores the possibility of the 2-5 members making plans to

8   initiate violence as the restrictions of the modified program were lessened or attempting to devise

9   ways to circumvent the restrictions.

10      In this situation, the court cannot find that allowing inmates to use the concrete yards was

11   a reasonable alternative.

12          3.  Conclusion

13      Based on the undisputed facts, the implementation of the 2-5 modified program was

14   reasonably justified by the circumstances and was not excessive in length.  The court also finds

15   that plaintiff's identification as a suspected 2-5 member was not unreasonable, nor is there

16   evidence that it was a result of the action of any of the defendants.  Finally, plaintiff has not

17   created a material issue of fact regarding the use of the concrete yards by the suspected 2-5

18   members as a reasonable alternative.  Defendants' motion for summary judgment on plaintiff's

19   Eighth Amendment claim regarding the deprivation of outdoor exercise against McDonald,

20   Davey, Van Leer, and Sanders should therefore be granted.

21          C.      Count V: Eighth Amendment (Inadequate Medical Care)

22      In order to state a §1983 claim for violation of the Eighth Amendment based on

23   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

24   deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

25   To prevail, plaintiff must show both that his medical needs were objectively serious, and that

26   defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 298-

27   99 (1991); McKinney v. Anderson, 959 F.2d 853, 854 (9th Cir. 1992) (on remand).  The requisite

28

1 state of mind for a medical claim is "deliberate indifference."  Hudson v. McMillian, 503 U.S. 1,

2 5 (1992).

3 "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

4 further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v.

5 Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds WMX Technologies v.

6 Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).  Examples of a serious medical need include

7 "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy

8 of comment or treatment; the presence of a medical condition that significantly affects an

9 individual's daily activities; or the existence of chronic and substantial pain."  Id. at 1059-60

10 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v.

11 Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989)).

12 In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court established a very

13 demanding standard for "deliberate indifference."  Negligence is insufficient.  Farmer, 511 U.S.

14 at 835.  Even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

15 which is so obvious that it should be known) is insufficient to establish an Eighth Amendment

16 violation.  Id. at 836-37.  It is not enough that a reasonable person would have known of the risk

17 or that a defendant should have known of the risk.  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th

18 Cir. 2004).  Rather, deliberate indifference is established only where the defendant *subjectively*

19 "knows of and disregards an *excessive risk* to inmate health and safety."  Id. (citation and internal

20 quotation marks omitted) (emphasis added).  Deliberate indifference can be established "by

21 showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need

22 and (b) harm caused by the indifference.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)

23 (citations omitted).

24 In the complaint, plaintiff alleges that defendant J. Clark deprived him of timely medical

25 care despite being aware of his suffering and having the ability to intervene.  ECF No. 1 at 20, ¶

26 153.  Specifically, he alleges that between February 22, 2010, and April 20, 2010, he submitted

27 three health care requests regarding his abdominal pain and diarrhea, but was not seen by

28 defendant Clark until April 28, 2010.  Id. at 18-19, ¶¶ 142-46.

Defendant Clark makes only a brief, conclusory argument that plaintiff did not have a serious medical need.  ECF No. 65-1 at 41.  Plaintiff's verified complaint alleges that he suffered "excruciating abdominal pain" and diarrhea that progressed in severity from February 22, 2010, and that after he received fiber tablets on April 30, 2010, his symptoms "began to surface more frequently than before and worsened to such degree of impairing plaintiff's daily activities and causing him significant and daily crippling pain without warning."  ECF No. 1 at 18-19, ¶¶ 142-43, 146.  His second and third health care requests also describe "reoccurring bouts of stomach pains, irregularity, [and] dia[rrhea]" and "crippling bouts of stomach pain."  ECF No. 77-2 at 38-39.  Plaintiff also previously provided a sworn declaration from his cellmate that described him as suffering from stomach pains that "kept him from performing activities such as in-cell cleaning, changing and washing his clothes/sheets."  ECF No. 64-2 at 143, ¶ 6.  The declaration also stated that plaintiff "would lay in bed on a regular basis until his symptoms subsided" and that once plaintiff received treatment he "was no longer bed-ridden for extended periods and was back to performing daily activities with regularity."  Id. at 143-44, ¶¶ 6, 9.  Additionally, the report from defendant Clark's examination of plaintiff on April 26, 2010, shows that he had lost ten pounds in the past six months.  ECF No. 77-2 at 39.  On these facts, plaintiff suffered from a serious medical need.  See T.W. Elec. Serv., Inc., 809 F.2d at 630 ("at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party").  Having found that plaintiff suffered from a serious medical need, the court turns to the question of whether defendant Clark was deliberately indifferent to that need.

The undisputed evidence shows that plaintiff submitted health care requests dated February 22, 2010; March 23, 2010; and April 20, 2010, related to his abdominal pain and diarrhea.  DSUF ¶¶ 193, 201, 206; ECF No. 77-2 at 37-39.  The first request was reviewed by another nurse on February 23, 2010.  DSUF ¶ 195; ECF No. 77-2 at 37.  In a sworn declaration, defendant Clark states that he did not see the February 22, 2010 request until March 18, 2010 (Declaration of J. Clark at 2, ¶ 6 [ECF No. 77-2 at 7]), and this statement is supported by the request itself, which was signed by Clark on March 18, 2010 (ECF No. 77-2 at 37).  In response, plaintiff argues that "[t]here is no credible evidence presented as to when defendant Clark

1    actually reviewed plaintiff's request.  Even though it was supposed to [be] reviewed within 24

2    hours."  Response to DSUF ¶ 196 [ECF No. 98 at 51].  To dispute Clark's statement, plaintiff

3    offers nothing but the speculative implication that Clark reviewed his request prior to March 18,

4    2010, and this is insufficient to create an issue of fact.  See, e.g., Taylor v. List, 880 F.2d 1040,

5    1045 (9th Cir. 1989) (conclusory allegations, unsupported by evidence are insufficient to defeat a

6    motion for summary judgment); see also Villarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061

7    (9th Cir. 2002) (no "genuine issue" of fact if only evidence presented is the "uncorroborated and

8    self-serving" testimony of the opposing party).  Plaintiff's argument that his request was to be

9    reviewed within twenty-four hours of submission is also insufficient to create an issue of fact

10   because the form shows that it was reviewed by another nurse within twenty-four hours of

11   submission (ECF No. 77-2 at 37) and plaintiff does not allege, nor does the evidence show, that

12   the initial review of health care requests had to be performed by defendant Clark specifically.

13          By the time defendant Clark reviewed plaintiff's request on March 18, 2010, plaintiff was

14   already scheduled to be seen by his primary care provider eight days later on March 26, 2010.

15   Id.; DSUF ¶ 197.  Clark states that, given that plaintiff stated his symptoms may have been

16   caused by something he ate and that plaintiff had not submitted a second health care request as of

17   March 18, 2010, he believed that plaintiff's health concern had likely resolved by that time.

18   Declaration of J. Clark at 2, ¶ 9 [DSUF ¶ 199].  Plaintiff does not dispute this fact, but argues that

19   Clark did not schedule him for another doctor's appointment.  Response to DSUF ¶ 199.

20   Presumably plaintiff believes that Clark should have scheduled him for an earlier appointment.

21   Plaintiff also argues, in response to Clark's statements that plaintiff's condition was not an

22   emergency and that he did not believe an earlier appointment was necessary, that Clark had no

23   basis for those beliefs without having first seen plaintiff.  Response to DSUF ¶¶ 198, 200.

24          Even if plaintiff was still suffering from his symptoms on March 18, 2010, he does not

25   dispute that defendant Clark believed his symptoms had resolved by that point.  Response to

26   DSUF ¶ 199.  Moreover, though plaintiff argues Clark had no basis for his belief that plaintiff did

27   not need to be seen sooner than March 26, 2010, Clark states that his belief was based upon

28   plaintiff's description of his condition and the lack of any additional health care requests during

52

1    the approximately three-and-a-half weeks between the date the request was submitted and when it

2    was seen by Clark.  Because it is undisputed that Clark believed plaintiff's symptoms had likely

3    resolved, plaintiff cannot show that on March 18, 2010, defendant Clark knew he had a serious

4    medical need.  The evidence also shows that even though Clark believed plaintiff's issues had

5    likely resolved, he did not ignore plaintiff's complaints because he noted on the request that

6    plaintiff was to keep his appointment with his primary care provider on March 26, 2010.  ECF

7    No. 77-2 at 37.  There is no evidence that Clark had any indication that the March 26, 2010

8    appointment would not take place.

9         Plaintiff's next health care request was dated March 23, 2010, and was reviewed by

10   defendant Clark on March 26, 2010.  DSUF ¶ 197; ECF No. 77-2 at 38.  Because plaintiff was

11   already scheduled to see his primary care provider that same day, Clark did not believe it was

12   necessary to schedule an additional appointment for plaintiff.  DSUF ¶ 203.  Plaintiff argues that

13   the appointment never took place, but does not dispute that an appointment was scheduled for that

14   day or that there is no evidence that Clark interfered with the appointment.  Response to DSUF ¶¶

15   197, 203, 205.  Instead, plaintiff argues that there is nothing to show that Clark took affirmative

16   steps to ensure the appointment took place, but he offers no evidence that would establish Clark

17   was responsible for ensuring the appointment took place or that Clark had any reason to believe a

18   scheduled appointment would not take place as scheduled.  DSUF ¶ 205.  Because plaintiff was

19   already scheduled to see a primary care provider who, unlike Clark, would be able to prescribe

20   medication and there is no evidence that Clark prevented that appointment, was responsible for

21   ensuring the appointment took place, or knew the appointment would not actually take place,

22   plaintiff cannot show that Clark ignored his serious medical need.

23        Plaintiff's final request for health care was dated April 20, 2010, and reviewed by Clark

24   on April 22, 2010.  DSUF ¶ 206; ECF No. 77-2 at 39.  Plaintiff was then seen by Clark six days

25   later on April 28, 2010.  DSUF ¶ 208; ECF No. 77-2 at 39.  During the exam plaintiff did not

26   appear to be suffering from symptoms and Clark noted plaintiff's history of IBS and previous

27   prescription for dicylomine.  DSOF ¶ 209; ECF No. 77-2 at 39.  Upon consultation with the

28   primary care provider, the primary care provider prescribed plaintiff with fiber tablets.  DSUF ¶

1   210.  Though plaintiff alleges that his symptoms worsened after he received the fiber tablets (ECF

2   No. 1 at 19, ¶ 146), he admits that defendant Clark was not responsible for that prescription or the

3   side effects he experienced (Response to DSUF ¶ 211).  The records do not show, nor does

4   plaintiff allege, any further involvement in his treatment by defendant Clark.  Plaintiff later had

5   an appointment with his primary care provider in May 2010, at which time dicyclomine was

6   prescribed and plaintiff's symptoms subsided.  DSUF ¶ 212.

7        Defendant Clark has provided a declaration from B. Barnett, M.D., who is board-certified

8   in family medicine and has been practicing medicine since the mid-1970s.  Declaration of B.

9   Barnett, M.D. at 1, ¶ 1 [ECF No. 77-2 at 10]; ECF No. 77-2 at 15.  Doctor Barnett states that

10  given that plaintiff's "complaints were consistent with his prior chronic condition which had been

11  intermittent and resolved on its own," scheduling plaintiff to be seen on April 28, 2010, in

12  response to the April 20, 2010 request was "entirely appropriate."  Declaration of B. Barnett at 3,

13  ¶¶ 15-17.  Plaintiff offers no evidence, and does not argue, that the time between the submission

14  of the April 20, 2010 request and his exam on April 28, 2010, was inappropriate.  Instead,

15  plaintiff's argument is that the cumulative delay between his first request, submitted February 22,

16  2010, and his exam on April 28, 2010, reflects deliberate indifference.  But, as set forth above,

17  defendant Clark did not know about plaintiff's health issues until March 18, 2010, and at the time

18  Clark reviewed the first two requests, plaintiff was already scheduled to see a primary care

19  provider.  There is no evidence that Clark was aware plaintiff did not actually see his provider

20  until Clark reviewed the April 20, 2010 request, at which point he scheduled plaintiff for an

21  exam.  Moreover, plaintiff's first health care request indicated an isolated issue, while his second

22  and third requests indicated a chronic condition, rather than an emergency condition, that was

23  intermittent, not continuous.  ECF No. 77-2 at 37-39.  In light of the circumstances leading up to

24  plaintiff's appointment with defendant Clark, plaintiff cannot show that Clark had the requisite

25  state of mind to be deliberately indifferent to his serious medical need because he did not examine

26  plaintiff until April 28, 2010.

27        For these reasons, the motion for summary judgment on plaintiff's Eighth Amendment

28  deliberate indifference claim against defendant Clark should be granted.

1    D.  Count VI: Fourteenth Amendment (Due Process)

2    The Due Process Clause of the Fourteenth Amendment protects prisoners from the

3 deprivation of life, liberty or property without due process of law.  Wolff v. McDonnell, 418 U.S.

4 539, 556 (1974).  However, "that prisoners retain rights under the Due Process Clause in no way

5 implies that these rights are not subject to restrictions imposed by the nature of the regime to

6 which they have been lawfully committed."  Id. (citations omitted).  Liberty interests may arise

7 from the Due Process Clause or from state law, but the Due Process Clause itself does not confer

8 on inmates a liberty interest in avoiding more adverse conditions of confinement.  Wilkinson v.

9 Austin, 545 U.S. 209, 221-22 (2005).  While states may in some circumstances create liberty

10 interests entitled to protection under the Due Process Clause, such

11
12
13

> interests will be generally limited to freedom from restraint which,
> while not exceeding the sentence in such an unexpected manner as
> to give rise to protection by the Due Process Clause of its own force
> nonetheless imposes atypical and significant hardship on the inmate
> in relation to the ordinary incidents of prison life.

14 Sandin v. Conner, 515 U.S. 472, 484 (1995) (internal citations omitted); see also, Mitchell v.

15 Dupnik, 75 F.3d 517, 522 (noting Sandin's re-focus of the test for existence of a liberty interest

16 "away from the wording of prison regulations and toward an examination of the hardship caused

17 by the prison's challenged action relative to 'the basic conditions' of life as a prisoner").  To

18 prevail on a claim of a due process violation plaintiff must first prove that he suffered "a

19 deprivation of a constitutionally protected liberty or property interest."  Brewster v. Bd. of Educ.

20 of Lynwood Unified Sch. Dist., 149 F.3d 971, 982 (9th Cir. 1998).  Second, he must show he was

21 denied adequate procedural protections.  Id.

22    Plaintiff alleges that defendants McDonald, Davey, Sanders, Van Leer, and Gower

23 violated his due process rights when they placed him in administrative segregation without the

24 appropriate due process safeguards.  ECF No. 1 at 21, ¶ 154.  Specifically, he alleges that he was

25 placed in administrative segregation without providing him with a hearing, information about the

26 charges or reason for segregation, or an opportunity to present a response.  Id. at 6, 10, ¶¶ 25, 59.

27 He was also denied periodic reviews of his placement in segregation.  Id. at 6, ¶ 25.  As the

28

1    undisputed facts have shown, plaintiff was not in administrative segregation, but was instead

2    under a modified program that was in place due to a set of violent, coordinated assaults by the 2-5

3    disruptive group, which plaintiff admits was implemented for the purpose of ensuring the safety

4    of the staff and inmates and was ended as soon as safely possible.

5        In Hayward v. Procunier, the Ninth Circuit held that inmates had no protected liberty

6    interest in avoiding a prison-wide lockdown.  629 F.2d 599, 601-02 (9th Cir. 1980), cert. denied,

7    451 U.S. 937 (1981).  The plaintiffs in Hayward were seeking procedural safeguards in response

8    to a prison-wide lockdown that lasted over five months.  Id. at 601.  Although the lockdown in

9    Hayward was institution-wide, the analysis applies equally to the collective lock-down of inmates

10   in a particular unit of a prison.  The Ninth Circuit held that the increased security of a five-month

11   lockdown for prisoners therein was a foreseeable consequence of a criminal conviction, and, as

12   such, it was not an atypical and significant hardship:

13 
14 
15 
16 
17 
18 
19 
20 
21 
> We do not find here the equivalent of a statute conferring a particular benefit, such as good behavior time or parole, with a specification of conditions under which that benefit can be lost.  See Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed.2d 935 (1974); Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed.2d 668 (1979).  The regulations here do not purport to enumerate specific reasons for which a prisoner can be placed in solitary confinement and to require documentation of those reasons.  See Wright v. Enomoto, 462 F. Supp. 397 (N.D. Cal.1976), aff'd mem., 434 U.S. 1052, 98 S. Ct. 1223, 55 L. Ed.2d 756 (1978).  Nor are prisoners being subjected to treatment wholly outside the foreseeable consequences of criminal conviction, such as commitment to a mental institution in the absence of a mental disease or defect.  See Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).

22   Hayward, 629 F.2d at 601-02.  The court found that the lockdown in Hayward was

23   distinguishable from other situations where inmates were found to have a right to a due process

24   hearing because it was not the conduct or fate of individual prisoners that was at issue.  Id. at 602.

25   In the case of a lockdown,

26 
27 
28 
> the facts in dispute are not those which would differentiate the plaintiffs from the general prison population and cause them to be subjected to distinctive treatment.  The conduct of the plaintiffs is not in issue.  Instead, the question to be decided is whether the degree of emergency justifies a continuation of the lockdown—a

1    determination involving a high degree of policy and prediction.

2    Id.

3          Here, plaintiff and other suspected members or associates of the 2-5 disruptive group were

4    isolated from other inmates in B-Facility and placed under a separate, more restrictive program

5    within the facility-wide modified program.  The undisputed evidence shows that plaintiff's

6    inclusion in the modified program was not due to any conduct by him, but due to his

7    identification as a possible member of the 2-5 disruptive group, the same as for all other inmates

8    included in the more restrictive portion of the modified program.  DSUF ¶¶ 115-16, 118.  It is

9    also undisputed that the modified program was implemented solely for the purpose of preventing

10   further violence by the 2-5 group and restoring order to the prison and that prison officials

11   believed it was necessary to isolate inmates affiliated with the 2-5 in order to stop the violence.

12   DSUF ¶¶ 79, 83, 109.  It is also undisputed that the modified program lasted only as long as was

13   necessary for the safety of the inmates and staff.  DSUF ¶ 80, 82-84.  There is no evidence that

14   the implementation of the modified program was intended to be punitive or disciplinary in any

15   way.

16         Plaintiff was subject to a modified program, not administrative segregation as he alleged

17   in the complaint.  As such, he had no protected liberty interest in remaining free of what was an

18   admittedly legitimate modified program and he was not entitled to due process.  Hayward, 629

19   F.2d at 601-02; Hurd v. Garcia, 471 F. App'x. 798, 800 (9th Cir. 2012) (affirming summary

20   judgment in favor of the defendant prison officials on a due process claim arising from a

21   lockdown); Snow v. Lamarque, 74 F. App'x 815, 816 (9th Cir. 2003) (affirming summary

22   judgment because "a prisoner is not entitled to a hearing before being placed on lockdown during

23   a prison emergency" and plaintiff failed to raise genuine issue as to whether emergency existed);

24   Furnace v. Evans, 459 F. App'x. 630, 632 (9th Cir. 2011) (affirming summary judgment finding

25   no due process required for twenty-month lockdown when genuine emergency existed); Corona

26   v. Harrington, No. CV F 08-0237 LJO DLB, 2010 WL 318555, at *8-9, 2010 U.S. Dist. LEXIS

27   4013, at *23-25 (E.D. Cal. Jan. 20, 2010) (granting motion to dismiss due process claim arising

28   from a five month lockdown of a "sub-group" of inmates).

1    For these reasons, summary judgment should be granted on plaintiff's claim that

2    defendants McDonald, Davey, Sanders, Van Leer, and Gower violated his due process rights.

3    XI.    Qualified Immunity

4    Government officials are immune from civil damages "unless their conduct violates

5    'clearly established statutory or constitutional rights of which a reasonable person would have

6    known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457

7    U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the court must consider the

8    following: (1) whether the alleged facts, taken in the light most favorable to the plaintiff,

9    demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether

10   the right at issue was clearly established at the time of the incident.  Saucier v. Katz, 533 U.S.

11   194, 201 (2001) overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling

12   Saucier's requirement that the two prongs be decided sequentially).

13   These questions may be addressed in the order most appropriate to "the circumstances in

14   the particular case at hand."  Pearson, 555 U.S. at 236.  Thus, if a court decides that plaintiff's

15   allegations do not support a statutory or constitutional violation, "there is no necessity for further

16   inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.  On the other hand, if a court

17   determines that the right at issue was not clearly established at the time of the defendant's alleged

18   misconduct, the court need not determine whether plaintiff's allegations support a statutory or

19   constitutional violation.  Pearson, 555 U.S. at 236-242.  Assuming that plaintiff has established

20   violations of his rights with respect to his claims that he was denied group religious activities,

21   outdoor exercise, and due process, defendants would be entitled to qualified immunity.

22   A.    Group Religious Activities and Outdoor Exercise

23   Assuming the deprivation of group religious activities and outdoor exercise constituted a

24   violation of plaintiff's constitutional rights, the court must determine whether this conduct

25   violated clearly established law.

26   It is not clearly established exactly how or when prison officials must lift a lockdown or

27   modified program implemented in response to threats to the safety and security of the institution

28   arising from violent inmate assaults or information that inmates plan to carry out further assaults

of other inmates or staff.  Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011) ("[I]t was not clearly established in 2002 – nor is it established yet – precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot."); Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2009); see also Ford v. Martel, 262 F. App'x. 777, 777 (9th Cir. 2007) (affirming summary judgment on First Amendment claim because there was no triable issue as to whether lockdown was legitimate action to maintain security or whether it prevented plaintiff from engaging in religiously mandated conduct).  As Norwood states, "[w]hen violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control."  591 F.3d at 1069.

In light of the undisputed evidence regarding the reasons for the modified program, the investigatory steps undertaken in responding to the events, and that prison officials lifted the modified program in stages depending upon the results of the investigations, it would not have been clear to a reasonable officer that restricting an inmate's outdoor exercise in conjunction with the modified program during the investigations at issue here was unlawful.  Moreover, while Noble and Norwood both deal with the deprivation of outdoor exercise, their reasoning applies equally to the suspension of group religious activities, and the court has been unable to identify any case law that would have alerted a reasonable officer that the restrictions on group religious activities during the modified program violated plaintiff's First Amendment rights.

Defendants are therefore entitled to qualified immunity for the 2-5 modified program. Accordingly, the court finds defendants should also be entitled to qualified immunity on the Eighth Amendment claim for denial of outdoor exercise and First Amendment claim for denial of group religious activities.

B.      Due Process

Even if plaintiff's allegations could be construed to state a due process claim, plaintiff has not cited, nor has the court found, authority for the proposition that a reasonable official would have known that placing plaintiff on modified program following inmate attacks on other inmates

59

1　created an "atypical and significant hardship" triggering procedural due process protections.  The

2　existing authority both in 2009 and currently indicates that an inmate does not have a protected

3　liberty interest triggering the requirement of notice and a hearing when prison officials impose

4　and maintain a lockdown or modified program in response to an emergency.  See Hayward, 629

5　F.2d at 601-03 (finding no due process right to a hearing when officials impose a lockdown);

6　Snow, 74 F. App'x at 816 (no entitlement to a hearing before being placed on lockdown during a

7　prison emergency); Hurd, 471 F. App'x. at 800 (no due process claim arising from a lockdown);

8　Furnace, 459 F. App'x. at 632 (no due process required for twenty-month lockdown when

9　genuine emergency existed); Corona, 2010 WL 318555, at *8-9, 2010 U.S. Dist. LEXIS 4013, at

10　*23-25 (no due process claim arising from  five month lockdown in 2006 of a "sub-group" of

11　inmates).

12　　　Therefore, dismissal of this claim is also warranted on qualified immunity grounds.

13　　　C.　　Conclusion

14　　　Defendants are therefore entitled to qualified immunity on the claims for denial of group

15　religious activities and outdoor exercise and denial of due process.

16　X.　Conclusion

17　　　For the reasons set forth above, defendants' motion for summary judgment (ECF No. 65)

18　should be granted.

19　　　Accordingly, IT IS HEREBY RECOMMENDED that:

20　　　1.  The following claims be dismissed without leave to amend for failure to state a claim:

21　　　　a.  Count I: First Amendment claim for denial of access to the courts;

22　　　　b.  Count V: Eighth Amendment claim for conditions of confinement based on

23　deprivation of hygiene items;

24　　　　c.  Count VIII: Fourteenth Amendment equal protection claim; and

25　　　　d.  Count IX: Conspiracy.

26　　　2.  The court decline to exercise supplemental jurisdiction over plaintiff's state law claims

27　and dismiss Count X.

28　/////

3. Defendants' motion for summary judgment (ECF No. 65) be granted for the reasons set forth above.

4. Judgment be entered for the defendants.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court, which shall be captioned "Objections to Magistrate Judge's Findings and Recommendations."  **Due to exigencies in the court's calendar, no extensions of time will be granted.**[38]  A copy of any objections filed with the court shall also be served on all parties. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 8, 2015

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

---

[38]  Plaintiff is informed that in order to obtain the district judge's independent review and preserve issues for appeal, he need only identify the findings and recommendations to which he objects.  There is no need to reproduce briefing on the issues.